198 So.2d 261

**Curtis Ray PARKER**

v.

**STATE.**

**6 Div. 145.**

Supreme Court of Alabama.

April 13, 1967.

John D. Prince, Jr., Birmingham, for appellant.

Richmond M. Flowers, Atty. Gen., and Leslie Hall, Asst. Atty. Gen., for the State.

HARWOOD, Justice.

Thomas Skinner, age 85, his wife Minerva, and his two grandchildren, Curtis Ray Skinner and Emmett James Skinner, lived in the home of Thomas Skinner in the rural section of Blount County. On 17 July 1963, this modest frame house caught on fire somewhere around 2:30 in the afternoon. It was apparently completely consumed by fire in 30 to 40 minutes. Four bodies, or the remnants thereof, identified as the above named people, were found in the ashes of the burned house.

This appellant, Curtis Ray Parker, was charged by separate indictments of murder in the first degree of Thomas Skinner, the grandfather, and of Curtis Skinner, one of the grandsons.

Very little of the bodies remained, though in the case of Curtis Skinner a human heart was recovered, and a portion of the lungs of the body identified as Thomas Skinner. A state toxicologist testified that an examination of the heart of Curtis Skinner failed to disclose any carbon monoxide present in the blood withdrawn from the heart, and the same was true as to the examination of the lungs of Thomas Skinner. From these findings it was the conclusion of the state toxicologist that Thomas Skinner and Curtis Skinner were dead before their bodies were burned, otherwise inhalation of the fumes from the fire would have produced traces of carbon monoxide in the organs examined.

The appellant was first tried for the murder of Thomas Skinner, and on the 15th of June 1964, the jury returned a verdict of guilty and assessed punishment as life imprisonment, judgment was pronounced pursuant to the verdict.

On 24 August 1964, the trial of the appellant for the murder of Curtis Skinner was begun, and a verdict of guilty of murder in the first degree was returned on 27 August 1964, with punishment again being assessed as life imprisonment, and on 27 August 1964, judgment was pronounced pursuant to this verdict.

Appeals were perfected in each case, and after much delay the records in each case were filed in this court on 20 January 1966.

These records are voluminous. The one in the case of Thomas Skinner being 425 pages, and the Curtis Skinner case 663 pages. The cases were combined for argument and a single brief was filed pertaining to each case. In this posture a review of the cases has been time consuming. In accord with our duty we have carefully read both records. The present review relates to the alleged murder of Curtis Skinner, the deceased grandson.

Prior to the trial below counsel for appellant filed three motions: (1) A motion for a change of venue, (2) A motion to quash the indictment on the grounds that negroes were systematically excluded from the jury rolls of Blount County, and (3) A motion for a continuance based on a request that appellant be furnished funds with which to make further investigations in behalf of the accused.

## Motion to Quash Indictment

■ At the hearing on this motion several Blount County court officials testified that while they had no recollection of any negro serving on the grand juries of Blount County, negroes had with regularity been summoned for jury service, and had served on petit juries in virtually every term of court for some years. It was further shown that negroes constitute 3% of the population of Blount County. Seven negroes testified that they had been summoned for jury duty within the relative immediate past years. Three had served on petit juries, three had asked to be excused because of occupations.

The grand jury is drawn by chance by the judge from names of veniremen placed in a receptacle or hat.

There was no showing of the number of persons on the jury roll of Blount County, either white or negro.

Clearly the appellant failed to show that negroes are systematically excluded from the jury rolls of Blount County, and the court properly denied the motion to quash the indictment. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759; Beecher v. State, 280 Ala. 283, 193 So.2d 505.

## Motion for Change of Venue

■ Each and every witness presented by appellant in support of his motion for a change of venue testified that in his opinion the appellant, and any member of the negro race, could and would secure a fair trial in Blount County.

In this state of the evidence no error resulted from the court's action in denying the appellant's motion for a change of venue. Coon v. State, 278 Ala. 581, 179 So.2d 710.

## Motion for Continuance in Order That Appellant be Furnished Investigative Assistance

In argument in support of his contention that the lower court erred in denying this motion, counsel cites and relies upon the provisions of a statute passed by Congress authorizing a court to allow to a defendant investigative expenses, after appropriate inquiry where such defendant is financially unable to provide such services for himself. See 18 U.S.C.A. § 3006A(e).

■ No law similar to the above statutory federal provisions exists in this state. The lower court was therefore without warrant of law to grant the relief sought, and properly denied the motion.

As before stated, the house was burned on the afternoon of 17 July 1963. The state introduced as a witness, Joe Hall, who testified that he had known the appellant for about two years. On the afternoon of 17 July 1963, he drove by the Skinner home and at that time he observed Thomas Skinner and the appellant on the porch of the house and the two grandsons nearby. The house was about fifty feet from the road. Hall was driving about 25 to 30 miles an hour in a pickup truck and did not notice anything unusual when he passed the house. About 40 minutes later on his return trip the house had burned completely down. He did not observe the appellant at the scene at this time.

On 19 July 1963, Mr. Ray Posey, a state investigator, and Paul Small, a deputy sheriff of Blount County, were at the scene of the fire continuing their investigation. Near a house about 300 feet from the burned Skinner house, they found footprints made by someone wearing a large shoe. These tracks were about six feet apart which would indicate that the party making them was running. These tracks were followed for a mile or so through the woods and fields up to the interstate highway. In some places the tracks were not too clear but

in other places where the dirt was sandy clay, the tracks were distinct.

Those following the tracks also found near the tracks a small red bag, referred to in the evidence as a mojo bag, and an identification card, both being the property of Thomas Skinner. A cloth name strip from the clothing of Curtis Parker was also found.

The state also introduced a witness, a relative of the Skinners who visited them often. He testified that Thomas Skinner would place silver coins in a tin box which he kept in a dresser drawer. This box was found in the ashes of the burned house, and no coins were in it. On the other hand, several of the state's witnesses, relatives and close associates of the Skinners, testified they had no knowledge of Skinner keeping coins in a box.

Testifying in his own behalf, the appellant denied any connection with the deaths of any of the parties, and averred that he had been in north Birmingham the entire day of 17 July 1963. The defense also presented a large number of witnesses whose testimony was directed toward establishing the appellant's alibi testimony, i. e., that he was in north Birmingham the entire day on which the Skinner house was burned.

The evidence presented by the state against this appellant was entirely circumstantial. The appellant strenuously denied harming any of the occupants of the house or burning it. He maintained he had been in north Birmingham the entire day of the fire. He introduced many witnesses to establish this alibi.

The cross examination of these alibi witnesses by the State's Attorney was vigorous, and in several instances went beyond allowable limits in that he would ask the witnesses if they had ever been "arrested," or ever been "in jail." When an affirmative answer was made, this line of questioning was continued with those witnesses who testified that they had been arrested one time, or two times, as the case may be,

for being drunk, or for "fussing." Such examination was patently improper, but counsel for appellant interposed no objections except during the cross examination of defense witness Samuel Low, wherein the record shows the following:

"Q. Sam, how many times have you been in the Birmingham jail?

"A. Well, I couldn't say exactly. Quite a few times.

"Q. As a matter of fact, you have been in so many times you can't tell this jury how many times.

"MR. PRINCE: I object to that. He is going too far afield. The prosecution has this information to their knowledge. That should not reflect on this. I object to them going on a fishing expedition.

"THE COURT: Have you asked him that question? He stated he had been in jail.

"THE WITNESS: Yes, sir.

"Q. How many times have you been in jail?

"A. I couldn't say.

"MR. PRINCE: I object.

"THE COURT: Overrule.

"MR. PRINCE: We except.

"Q. As many as twenty-five times?

"A. Not that many.

"Q. Twenty times?

"A. About 12, I imagine.

"Q. Twelve you guess, what were you in jail for Sam?

"A. Intoxication."

In the above ruling the court committed reversible error.

Section 434, Title 7, Code of Alabama 1940, relating to competency and credibility of witness as affected by prior con-

victions for crimes involving moral turpitude, invisions a *conviction* for such crime, not merely an arrest, or being in jail. For this reason it is well settled that a mere accusation, arrest, or confinement in jail, even for a crime involving moral turpitude cannot be shown. Meador v. State, 37 Ala. App. 573, 72 So.2d 418. Further, the offense of public drunkenness does not involve moral turpitude, in that conviction for any offense involving a violation of our state liquor laws is not considered as involving moral turpitude. Whitman v. State, 41 Ala.App 124, 124 So.2d 275. Further yet, it is common knowledge that the Birmingham jail is for the incarceration of persons charged or sentenced for violation of the ordinances of the City of Birmingham. Implicit in the question, "How many times have you been in the Birmingham jail?" is that the person therein was incarcerated under charges or convictions of violating the municipal ordinances of the City of Birmingham. Only convictions under state laws of crimes involving moral turpitude are admissible under Section 434, supra, and convictions of violating municipal ordinances may not be shown. Huggins v. State, 271 Ala. 428, 123 So.2d 911.

■ The question above to which the objection was overruled sought evidence which was manifestly illegal and obnoxious to all rules of evidence. The question could not have been rendered legal by reframing, or the introduction of other evidence. The objection interposed was therefore sufficient. Meador v. State, supra.

In event of another trial, we feel it advisable to make some observations as to certain testimony to the effect that tracks found two days later in the vicinity of the burned house matched the shoes of the appellant which he was wearing in jail, also two days later, and the effect of the elimination of this evidence upon the structure of the state's case. Such point cannot be reached in this review in that the record fails to show that charges affirmative in nature were requested, nor was any motion for a new trial made. In this state of the record the lower court was also shackled in the premises.

The appellant had been taken into custody on 19 July 1963, and the investigators went to the jail in Blount County and requested the appellant to give them his shoes which the appellant did, apparently voluntarily. Returning to the scene the officers placed these shoes in several of the tracks, and testified it was their opinion that the shoes fit the tracks.

The evidence further shows that one shoe print was about an inch deep and was the most distinct of all the shoe prints. Investigator Posey had with him about a pint of plaster of paris material with which to make the cast of this track which was made by a left shoe. According to Mr. Posey, he should have had a quart of plaster of paris material to make a satisfactory cast. It was the state's contention that this cast was not satisfactory, and therefore had not been introduced in evidence. However, upon demand of defense counsel, this cast was produced and was introduced in evidence as an exhibit by the defense.

We have en banc most carefully examined this cast and compared it with the left shoe surrendered by the appellant and which had been introduced in evidence as an exhibit for the state. In connection with a comparison of the left shoe of the appellant, and the cast, we excerpt the following from the testimony of Mr. Posey on cross examination:

"Q. (BY MR. PRINCE) Mr. Posey,—

"A. Yes, sir.

"Q. (continuing) You know—you now say that this footprint is from the left shoe?

"A. That is correct.

"Q. And looking at the left shoe, which is State's Exhibit, I will ask you if the front of this heel does not make an arc?

"A.   Somewhat in the vicinity.

"Q.   And looking at Defendant's Exhibit Number One, I will ask you if the front of that heel doesn't go straight across?

"A.   Apparently, it does."

It is true that the cast of this left foot track is thin, being about a fourth of an inch in thickness along the sole of the shoe. However, it distinctly shows the outline of the shoe, and that portion of the cast of the heel shows plainly the entire heel of the shoe print. By measurement the heel of the cast is three and twelve sixteenths of an inch in length and the front of the heel is straight. The heel on the left shoe is three and seven sixteenths of an inch in length and the front of the heel has an arc in it readily discernible. The front of the heel of the cast where it joins the sole is four sixteenths of an inch in depth, while the depth of the heel of the shoe is seven sixteenths of an inch. Furthermore, an examination of the last or shape of the sole discloses that the toe of the shoe is narrower to a perceptible degree than is the toe of the shoe making the track. In other words, the toe of the shoe as shown by the cast is perceptibly wider and more rounded than is the toe of the shoe itself.

In view of these perfectly apparent distinctions between the shoe and the cast of the shoe print, we feel that it must be concluded that this demonstrative evidence shows beyond peradventure that the shoe of the appellant did not make the shoe print demonstrated by the cast.

█   Where testimony is inherently and physically impossible because irreconcilable with physical facts and common observation, such testimony is to be disregarded as being without probative value, even though uncontradicted. King et al. v. Brindley et al., 255 Ala. 425, 51 So.2d 870.

█   The testimony that the shoe of the appellant matched the print must, under the above principle, be laid aside.

█   Then actually the only remaining evidence tending to connect this appellant with the murder with which he was charged, is the state's evidence tending to show that he was observed on the porch shortly before the fire occurred. This merely showed a possibility that this appellant may have committed the offense. However, the possibility that a thing may occur is not alone evidence even circumstantially, that the thing did occur. Taylor v. State, 30 Ala.App. 316, 5 So.2d 117. See especially Lang v. State, 252 Ala. 640, 42 So.2d 512.

In Ex parte Acree, 63 Ala. 234, this court, through Stone, J., wrote:

"The humane provisions of the law are, that a prisoner, charged with a felony, should not be convicted on circumstantial evidence, unless it shows by a full measure of proof that the defendant is guilty. Such proof is always insufficient, unless it excludes, to a moral certainty, every other reasonable hypothesis, but that of the guilt of the accused. No matter how strong the circumstances, if they can be reconciled with the theory that some other person may have done the act, then the defendant is not shown to be guilty, by that full measure of proof which the law requires."

Regardless of natural outrage when considering the deaths of these four people, we are clear to the conclusion that, after making all proper allowances, and indulging all reasonable intendments in favor of the verdict and judgment, it can only be concluded that they are not supported by sufficient evidence to permit them to stand. As stated in Blasengame v. State, 34 Ala.App. 85, 37 So.2d 225:

"One of the basic tenets of our Constitution and common law jurisprudence is that only the guilty shall be punished. The liberty of every individual reverts to and depends upon the absolute preservation of this shining principle. Its illumination must not be dimmed by the

character of the person upon whom it falls."

The only inference raised by the state's evidence presented in this case is that it was possible that this appellant may have committed this offense. Beyond this possibility, resort must be had to surmise, speculation, and suspicion to establish the appellant's criminal agency in the offense charged. No rule is more fundamental or better settled than that convictions cannot be predicated on such bases. See 6 Ala. Digest, Criminal Law, ☞560, for innumerable cases enunciating this doctrine.

If the evidence in a criminal case raises a mere suspicion, or, admitting all it tends to prove, a defendant's guilt is left in uncertainty, or dependent upon conjecture or probability, the court should instruct the jury to acquit, for such evidence does not overcome, prima facie, the presumption of innocence with which every accused is charitably clothed under our system of jurisprudence.

Reversed and remanded.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.