Sarah Frances M. Weathers was indicted for the murder of her mother-in-law, Maggie Weathers, "by shooting her with a pistol", in violation of § 13A-6-2, Code of Alabama 1975. The jury found her "guilty of murder" and the trial judge sentenced her to life imprisonment in the penitentiary.
On March 4, 1982, at approximately 4:00 p.m., Sidney Chapman, owner of Chapman Funeral Home, was called to the residence of Mrs. Maggie Weathers.
Upon his arrival at Mrs. Weathers' home, Chapman went into the bathroom and discovered the body of Mrs. Weathers. He examined the deceased's body and discovered that her skull had been crushed.
At this time, he did not detect a bullet wound on the body, and he had no idea the deceased had been shot. He talked to the deceased's son, Carl Weathers, Jr., about the possibility of calling the Sheriff because of the unusual amount of blood found on the body and the surrounding areas.
Gertie Reynolds, a neighbor of the deceased, received a call concerning the death. She picked up some other neighbors, the Eddings, and they went to the deceased's house. Junior Weathers, the appellant and their son, Nathan, were there when they arrived.
After Mrs. Reynolds viewed the body, she went home, changed clothes and dialed 911 to get the Sheriff.
Mrs. Reynolds stated she visited at the deceased's home on occasions and knew a pistol was kept in the home but she did not see it on that day.
She testified she was not aware of prowlers in their neighborhood, but admitted she had heard of prowlers in their neighborhood. Their neighborhood was located in the country close to the backwater, an area which fishermen frequent.
Reverend and Mrs. Gordon Eddings testified that the appellant called them about Mrs. Weathers' death and they came to her residence shortly thereafter.
A.G. Tew, an investigator with the Alabama Bureau of Investigation, was called to the deceased's residence on March 4, 1982, by Barbour County Sheriff, Robert Smith. Smith told him there was a possibility of foul play.
When he arrived, he saw the appellant and Junior Weathers and admitted they both seemed grief stricken. Tew examined the back of the deceased's head and it felt like the bones in her skull had been crushed or separated because they were loose. He did not notice a bullet wound on the deceased at this time.
The house was secured and a search for evidence was conducted. Tew did not see any sign of forced entry and indicated some of the windows had unbroken cobwebs attached to them. The house had not been ransacked and nothing was found missing. In fact, the deceased's purse was found on the daybed and it contained $174.98 cash.
To Tew's knowledge, the appellant was the last person to see the deceased alive. The appellant stated her mother-in-law was on the daybed in the den when she left to pick up Junior Weathers from work at American Builders Company. The deceased *Page 1313 
did not go with her into town because she was not feeling well.
When the appellant arrived at American Builders Company, she went to the guard shack to call and check on her mother-in-law. The deceased told the appellant she was feeling dizzy and thought she had heard some prowlers around the house. The appellant assured her mother-in-law they would come directly home.
The appellant, her husband, Junior Weathers, and their son, Nathan, returned home in less than one hour after going to the bank to cash a check, paying the power bill and picking up some feed at the Rainbow Farm Center.
At this point, the appellant told Tew she did not wish to answer any more questions because it "might make her look conspicuous." (R. 94).
Neither the appellant, nor Junior Weathers said anything to the police about a gun, until the investigators found their .38 revolver in a chest of drawers after they were notified that the deceased had been shot. Junior Weathers first told Tew that when he found his mother in the bathroom, he looked for the gun and found it in the chest of drawers, where they kept it in his and the appellant's bedroom. Later he said that after the appellant pointed to the gun on the daybed, he put it away in the chest of drawers. He told Tew that it was customary to leave the gun out for his mother as protection at times.
The appellant told Tew she had begun leaving the gun out for the deceased on the day before she was killed. On that day, she had cleaned the gun, loaded it and placed it on the daybed for the deceased. She had left the gun concealed on the daybed for the deceased the day she died.
Tew delivered to the Department of Forensic Sciences the .38 revolver and some ammunition which were found in the chest of drawers and a projectile which was removed from the wall in the bathroom closet. Tew admitted that no check for fingerprints was done anywhere in the house and that the appellant's hands were never swabbed for any gunpowder residue.
Dr. Thomas Gilchrist, a pathologist employed by the Department of Forensic Sciences, conducted the autopsy on the body of Maggie Weathers. He found two gunshot wounds. One entered the tip of her nose and the other was a flesh wound on the left side of the body.
He determined the cause of death to be a gunshot wound to the head. He removed the bullet from the deceased's head and gave it to Lonnie Harden, the toolmark and firearms coordinator for the Department of Forensic Sciences.
Dr. Gilchrist indicated he did not find any evidence that the pistol had been fired at close range to the deceased.
Charles Brooks, the lab administrator of the Enterprise Lab of the Department of Forensic Sciences assisted in the investigation and stated that no fingerprint checks were made anywhere in the house.
Joe Saloom, also with the Enterprise Lab, testified that there were no usable fingerprints on the gun because it had been recently cleaned.
Lonnie Harden did not testify but a stipulation was entered that he compared the .38 revolver and the two projectiles he received and concluded the two bullets were fired from this .38 caliber pistol.
A stipulation was also made that Thomas Hopen, a criminalist with the Department of Forensic Sciences, found the presence of gunpowder residue under a fingernail of the deceased's right hand and on the left palm area. This would be consistent with a person having recently fired a gun, handled a recently fired gun, or come in close contact with a recently fired gun.
B.J. Gatlin, an investigator with the District Attorney's office, stated that after an x-ray of the deceased's body revealed the presence of a bullet in her head, a search for a weapon was conducted. They located a pistol, contained in a holster, in a chest of drawers in the bedroom shared by Junior Weathers, the appellant and their young *Page 1314 
son. No attempt was made to lift fingerprints from this pistol.
Morell Powers maintains the guard shack at American Builders Company during his shift. On March 4, 1982, the appellant came into the guard shack with her son. She appeared nervous and asked to use the phone so she could check on her mother-in-law who wasn't feeling well.
The appellant made several unsuccessful attempts to dial the number, so he dialed the number for her. When Powers heard the phone ring, he handed the phone to the appellant. Powers heard the appellant ask how "Nanny" was feeling and then a comment about a prowler around the house. The appellant then stated they would go straight home.
Powers said he did not hear anyone else on the line, but admitted his ability to hear would depend on how loud the person on the other line spoke.
Betty Richards, an employee of the city of Eufaula Housing Authority, testified that in October or November of 1981, the appellant called her and inquired about possible housing opportunities. Mrs. Richards referred her to Mary Lou Blinov.
Mary Lou Blinov stated that the appellant called her in October or November of 1981 and talked to her about the possibility of renting one of the four apartments which Mrs. Blinov owns.
The appellant told Mrs. Blinov she was living with her husband, their child and mother-in-law, and she wanted to move out. She stated she and her mother-in-law had differences and her husband would always take his mother's side. Her mother-in-law and her husband both dipped snuff and she wanted to get her child out of that filth and hopefully her husband would join her.
The appellant said she did not have the money for the deposit but she would try and get it. Later, she called back and said she was unable to make the deposit.
James John Ragan, a life insurance salesman, testified he drove by the deceased's house while he was on his debit route on March 4, 1982, at 1:30 p.m. The appellant and her child were across the road from the house and he stopped and talked to the appellant about purchasing some chicken wire. He was told he needed to speak with her husband who would be home around 4:00 p.m.
Ragan stated that the appellant was not nervous but wasn't completely calm either.
Sarah Arnold, the deceased's daughter, stated she had never seen a gun around the house and did not know a gun was left out for her mother. Her mother was scared of guns.
Mrs. Arnold had not heard of any prowlers around the neighborhood but she knew her mother always kept the doors locked. She was not aware of any differences or hard feelings between her mother and the appellant.
After the State rested, defense counsel made a motion to exclude and a motion for acquittal. Both of these motions were denied by the trial judge.
The first witness for the defense was Carl Weathers, Jr., the appellant's husband of six years. On the day of the murder, the appellant drove him to work about 6:15 a.m. so he could be at work at 7:00 a.m. Before he left, his mother told him she was not feeling well but she would come with the appellant to pick him up from work if she felt better.
When he got off work at 3:00 p.m., the appellant and their son were there to pick him up. The appellant did not seem nervous or upset. She told him that his mother was not feeling well, and that she had called to check on her and his mother had told her about the prowlers. Weathers assured his wife that there weren't any prowlers in the daytime and that his mother had probably been frightened by a brick falling from the chimney which was in need of repair.
The Weathers then ran their errands to the bank, to the power company and to the feed store. When they arrived home, Weathers went in the house. The door was unlocked. Weathers called for his mother but heard no answer. He went outside to *Page 1315 
see if she had gone out in the yard but couldn't find her there either. When Weathers went back in the house, he found his mother slumped in the pantry in the bathroom with her head in a refrigerator pan filled with jars. His mother was limber so he laid her on her back on the floor. Weathers thought his mother had fallen after a dizzy spell, cut her head and died.
He told the appellant his mother was "gone" and to call the neighbors. Before the neighbors arrived, the appellant pointed to the gun on the daybed. He picked it up and put it in the chest of drawers. Weathers owned this pistol for several years and had taught his mother how to shoot it on one occasion. It was customary for the pistol to be left out with his mother when they would be gone. He stated he had no idea how his mother had been murdered until the police told him she had been shot late that evening.
Weathers said he and the appellant were not having any marital problems and he did not believe his wife killed his mother.
Gloria Ann Beavers stated she often took the Weathers' son to school but she could not remember if she had on March 4, 1982. She saw the appellant and Nathan outside across the road from the house that afternoon around 1:35 p.m.
Mrs. Beavers lived in the same neighborhood as the Weathers. One night in January or February of 1982, she called Weathers to come to her house because she thought she heard a prowler around her house.
Norman McCraney, Doug McCraney and John McCraney, Sr., relatives of the appellant, testified the windows of the Weathers' home were easy to open from the outside.
The appellant testified that her mother had died in a tornado in April of 1981 and she began thinking about moving out because she was somewhat depressed and wanted to be by herself, but that had soon passed. She said that her mother-in-law had not interfered in her marriage and the dipping snuff did not irritate her so much that she wanted to move out of the Weathers' home.
On March 4, 1982, she took her husband to work at 6:15 a.m. When she came home, she got her son ready for school and Gloria Beavers picked him up around 7:30 a.m. When she left to pick her son up from school at 11:15 a.m., she put the gun on the daybed for her mother-in-law. When she and her son returned home, her son took a nap while she watched soap operas with her mother-in-law. After her son woke up, the appellant took him outside to play across the street from the house.
While they were outside the insurance man came by and she told him to come back around 3:30 or 4:00 p.m. The two stayed outside until 2:10 p.m. when the mail came.
When they went back to the house, the appellant asked the deceased if she wanted to go to town with them to pick up Junior Weathers. The deceased said she didn't think she would because she still wasn't feeling well. The appellant left her at home on the daybed and the pistol was beside her concealed under a blanket.
When she arrived at her husband's place of employment, American Builders Company, she took her son into the guard shack to get a drink of water and decided to call and check on her mother-in-law. She tried several times to get through to the number but she could not, so she had the guard try the number. He got through and gave her the phone. When she spoke to her mother-in-law, she told the appellant something about prowlers around the house. The appellant told her they were on their way home.
When the appellant saw her husband, she related to him the conversation she had with his mother. He was not worried about the prowlers, so they ran their errands and got home before 4:00 p.m.
After discovering his mother's body in the bathroom, Junior Weathers told the appellant that his mother was "gone" and to call the neighbors. The appellant noticed the pistol lying on the daybed and told her husband, Junior Weathers, to put it away. *Page 1316 
The appellant denied that she had had an argument with her mother-in-law on the day on which she was killed, and said there was no ill will between them. She testified that she did not kill her mother-in-law.
The defense put on several people who testified as to the good reputation of the appellant in the community where she lived.
 I
The appellant contends the State failed to present sufficient evidence to establish a prima facie case or evidence which would support the jury's verdict of guilt, and therefore, her conviction is due to be reversed.
The evidence presented by the State clearly shows that Maggie Weathers was murdered by someone. The issue before us is whether or not the State proved beyond a reasonable doubt that the appellant was the person who committed this act of murder.
The standard form of review which this court must apply is whether there was sufficient legal evidence from which the jury, by fair inference, could conclude that the appellant was guilty of this murder beyond a reasonable doubt. Thomas v.State, 363 So.2d 1020 (Ala.Cr.App. 1978).
In Thomas v. State, supra, Judge Bowen stated;
 "While a jury is under a duty to draw whatever permissible inferences it may from the evidence, including circumstantial evidence, mere speculation, conjecture, or surmise that the accused is guilty of the offense charged does not authorize a conviction. Smith v. State, 345 So.2d 325 (Ala.Cr.App.), cert. quashed, 345 So.2d 329 (Ala. 1976); Colley v. State, 41 Ala. App. [273] 275, 128 So.2d 525 (1961). A defendant should not be convicted on mere suspicion or out of fear that he might have committed the crime. Harnage v. State, 49 Ala. App. 563, 274 So.2d 333 (1972). While reasonable inferences from the evidence may furnish a basis for proof beyond a reasonable doubt, Royals v. State, 36 Ala. App. 11, 56 So.2d 363, cert. denied, 256 Ala. 390, 56 So.2d 368
(1952), mere possibility, suspicion, or guesswork, no matter how strong, will not overturn the presumption of innocence. Sauls v. State, 29 Ala. App. 587, 199 So. 254 (1941); Riley v. State, 28 Ala. App. 389, 187 So. 247 (1939); Rungan v. State, 25 Ala. App. 287, 145 So. 171 (1932); Guin v. State, 19 Ala. App. 67, 94 So. 788 (1922).
 "An inference is merely a permissible deduction from the proven facts which the jury may accept or reject or give such probative value to as it wishes. Roberts v. State, 346 So.2d 473 (Ala.Cr.App.), cert. denied 346 So.2d 478 (Ala. 1978); Hale v. State, 45 Ala. App. 97, 225 So.2d 787, cert. denied 284 Ala. 730, 225 So.2d 790 (1969); Orr v. State, 32 Ala. App. 77, 21 So.2d 574 (1945); It is a logical and reasonable deduction from the evidence and is not supposition or conjecture. Guesswork is not a substitute. Stambaugh v. Hayes, 44 N.M. 443, 103 P.2d 640 (1940); Bolt v. Davis, 70 N.M. 449, 374 P.2d 648
(1962). A supposition is a conjecture based on the possibility or probability that a thing could have or may have occurred without proof that it did occur. Louisville N.R. Co. v. Mann's Adm'r, 227 Ky. 399, 13 S.W.2d 257 (1929). The possibility that a thing may occur is not alone evidence, even circumstantially, that the thing did occur. Parker v. State, 280 Ala. 685, 198 So.2d 261 (1967); Miller-Brent Lumber Co. v. Douglas, 167 Ala. 286, 52 So. 414 (1910)."
The mere fact that a person charged with a crime had the opportunity to commit that crime, standing alone, will not sustain a conviction. Lloyd v. State, 50 Ala. App. 646,282 So.2d 85 (1973).
The possibility that this appellant may have killed the deceased is not enough to prove that she did so.
Circumstantial evidence is sufficient to support a conviction only if the evidence is consistent with the hypothesis that the accused is guilty and inconsistent with any reasonable hypothesis that he or she is innocent. Thomas v.State, supra; Johnston v. State, 387 So.2d 891
(Ala.Cr.App. 1980). *Page 1317 
 "The test we are to apply is not whether we think that appellant is guilty. A verdict finding a defendant guilty in a criminal case is wrong and unjust, even though defendant is guilty, if the evidence of his guilt is not strong enough to meet the legal test required as stated above. Such a verdict, when properly challenged, cannot stand, even though there is strong reason to believe that if all of the true facts were known and shown in evidence guilt would be conclusively established."
Graham v. State, 374 So.2d 929 (Ala.Cr.App. 1979);Johnston v. State, supra.
The investigators in this case admitted that no fingerprint check was made of the inside of the house, or of the murder weapon itself and that there was no attempt to swab the appellant's hands for gunpowder residue. No evidence was presented that the deceased and the appellant had an argument on the day of the murder or that any ill will existed between the two of them.
The only evidence of the appellant's guilt presented by the State was that the appellant was the last person to see the deceased alive, that the deceased was killed with the family gun and the appellant gave inconsistent statements about this gun, and that the appellant had wanted to move out of the deceased's house some five or six months prior to the murder because the deceased dipped snuff.
The evidence presented at trial created no more than mere suspicion or conjecture that this appellant killed the deceased. The same proof could have been shown that someone other than the appellant murdered the deceased.
 ". . . [I]f the facts and circumstances can be reconciled with the theory that some agency other than the accused may have caused the death, then the accused is not shown to be guilty by that full measure of proof which the court requires." (Citations omitted).
Bluth v. State, 38 Ala. App. 692, 92 So.2d 685 (1957).
In viewing this evidence contained in the record most favorable to the State, we do not believe the evidence was inconsistent with a reasonable theory that the appellant was innocent. We hold, therefore, that the trial court erred in overruling the appellant's motion to exclude and for an acquittal and also her motion for a new trial. Therefore, the judgment of the trial court must be and is hereby reversed and rendered.
REVERSED AND RENDERED.
All the Judges concur.