Jim Abernethy was indicted for commercial bribery in violation of Alabama Code 1975, § 13A-11-120; unlawful trade practice in violation of Alabama Code 1975, § 8-19-5; and tampering with a sports contest in violation of Alabama Code 1975, § 13A-11-143. In the Circuit Court of Lee County, Alabama, a jury acquitted him of the first two offenses but found him guilty of tampering with a sports contest. Sentence was one year imprisonment and a $2,000 fine. This is an appeal from that conviction and is a case of first impression.
 I
The facts of this case show that Kevin Porter was attending Auburn University on a football scholarship. In 1987, Porter was an outstanding football player and was ranked the number one cornerback in the nation.
On August 3, 1987, just before the beginning of Porter's senior year at Auburn, Porter signed a three-year contract with sports agent Jim Abernethy at Abernethy's office in Atlanta, Georgia. In the contract, Abernethy agreed to "represent [Porter] in the negotiation of professional sporting contracts and commercial endorsement contracts." Under the terms of the contract, Porter was to pay Abernethy 5% of his base salary for each contract negotiated and 10% of the endorsement fees negotiated by Abernethy. Porter testified that he needed money because his mother was in serious financial trouble. In return for representation by Abernethy, Porter agreed to "play ball."
Upon signing the contract, Abernethy gave Porter $2,000 and was to give Porter $900 each month, plus $400 for Thanksgiving and $500 for Christmas. Porter was also to receive $100 for every interception he made. Porter received $900 in September and that same amount in October of 1987, but did not receive any additional funds or payments from Abernethy because Abernethy went out of the sports agent business.
At all times in question, Auburn was a member of the National Collegiate Athletic Association and was governed by N.C.A.A. rules and regulations. Those rules prohibited the "professionalization" of a student athlete and provided that a player was not eligible to participate in a sport if that player had "ever taken pay, or the promise of pay for competing in that sport" or if the player had "ever agreed to have an agent market . . . [that player's] athletic ability or reputation in that sport." The contract between Abernethy and Porter was in violation of N.C.A.A. rules and rendered Porter ineligible to play football for Auburn. Porter testified to the effect that "you're supposed to be declared ineligible" but you remain eligible after signing an agent contract "pending that the University doesn't find out." Porter stated that Abernethy told him "never to tell anyone [about their relationship] because it would destroy his own reputation."
Abernethy dissolved his sports agency, Jim Abernethy Sports, Inc., in November of 1987. On December 15, 1987, an article appeared in The Atlanta Constitution concerning a sports agent investigation conducted by reporter Chris Mortenson. The article publicized Abernethy's activities involving Porter and several other college athletes. At trial, Mortenson testified that one of the reasons Abernethy divulged his activities was because Abernethy said he had had a "religious experience." Mortenson testified that initially Abernethy "vehemently denied involvement" with the players but then admitted that he "lied to protect the players," and that he "felt a real responsibility to the athletes, a real loyalty, and [he] didn't want to see all of these kids hurt."
Even though technically ineligible, Porter played in all eleven of Auburn's 1987-88 season football games. However, after publication of the newspaper article, he was declared ineligible because of his dealings with Abernethy and was not permitted to play in the U.S.F. G. Sugar Bowl.
At trial, the parties agreed to three stipulations. One, that before this case, there had never been an attempted prosecution of any sports agent in Alabama for affecting the eligibility of a student-athlete. *Page 187 
Two, that in the past, there had been numerous instances in this state where student-athletes had violated N.C.A.A. rules and regulations and had been declared ineligible. Three, that there had been instances where players had been discovered to have been ineligible for accepting favors, signing with agents, or other reasons only after the players had either played all of their games or after their ordinary period of eligibility had ended, and there had been no prosecution of any athlete, sports agent, or third party. This Court has neither been cited nor found any reported case involving the conviction of a sports agent.
 II
This Court has thoroughly and repeatedly reviewed and scrutinized the evidence the State presented against Abernethy for any fact, circumstance, or inference of criminal intent. Not only have we found none, but we are convinced that the State's evidence proved that Abernethy did not have the requisite criminal intent in his association with Porter.
Abernethy was convicted of tampering with a sports contest. The indictment charged that:
 "Abernethy . . . did with intent to influence the outcome of a sports contest, to-wit: an intercollegiate football game of Auburn University's 1987 football season, knowingly tamper with a sports participant, to-wit: one Kevin Porter, a football player for Auburn University, in a manner contrary to the rules and usages purporting to govern the sports contest in question, to-wit: by providing said player with monetary consideration pursuant to a contract relating to said player's athletic performance and athletic services, in violation of governing rules of the National Collegiate Athletic Association and its Constitution, in violation of § 13A-11-143, Alabama Code 1975."
Alabama Code 1975, § 13A-11-143, defines the crime of tampering with a sports contest. It provides:
 "(a) A person commits the crime of tampering with a sports contest if, with intent to influence the outcome of a sports contest, he:
 "(1) Tampers with any sports participant or sports official, or with any animal, equipment or other thing involved in the conduct or operation of a sports contest, in a manner contrary to the rules and usages purporting to govern the sports contest in question; or
 "(2) Substitutes a sports participant, animal, equipment or other thing involved in the conduct or operation of a sports contest, for the genuine person, animal or thing.
 "(b) Tampering with a sports contest is a Class A misdemeanor."
This section was enacted as part of the Alabama Criminal Code. 1977 Ala. Acts, No. 607, at § 4215 at 875 (May 16, 1977). It introduced a new offense to the criminal law of this state. §13A-11-143 Commentary.
A statute defining a crime must be strictly construed and "one cannot commit an offense under a statute except in the circumstances it specifies." Peinhardt v. State, 161 Ala. 70,49 So. 831, 832 (1909), overruled on other grounds, Williams v.State, 177 Ala. 34, 58 So. 921, 923 (1912). The rules of statutory construction which this Court must follow were succinctly set out in Clements v. State, 370 So.2d 723, 725
(Ala. 1979), overruled on other grounds, Beck v. State,396 So.2d 645 (Ala. 1980):
 "There are several long-settled rules of construction to which we are bound in our review of this cause.
 "A basic rule of review in criminal cases is that criminal statutes are to be strictly construed in favor of those persons sought to be subjected to their operation, i.e., defendants. Schenher v. State, 38 Ala. App. 573, 90 So.2d 234, cert. denied, 265 Ala. 700, 90 So.2d 238 (1956).
 "Penal statutes are to reach no further in meaning than their words. Fuller v. State, 257 Ala. 502, 60 So.2d 202 (1952).
 "One who commits an act which does not come within the words of a criminal statute, according to the general and *Page 188 
popular understanding of those words, when they are not used technically, is not to be punished thereunder, merely because the act may contravene the policy of the statute. Fuller v. State, supra, citing Young's Case, 58 Ala. 358 (1877).
 "No person is to be made subject to penal statutes by implication and all doubts concerning their interpretation are to predominate in favor of the accused. Fuller v. State, supra."
The crime of tampering with a sports contest requires proof that the tampering was done "with the intent to influence the outcome of a sports contest." Alabama Code 1975, §13A-11-143(a). "A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct." Alabama Code 1975, § 13A-2-2(1). In the context of this case, a violation of the N.C.A.A. rules and regulations does not constitute the criminal offense of tampering with a sports contest unless that violation was done "with the intent to influence the outcome of a sports contest." Mere tampering with a player's eligibility in violation of N.C.A.A. rules is not a criminal offense unless done with the specific intent to influence the outcome of a sports contest.
Because the word "outcome" is not defined by statute, it must be given its "natural, plain, ordinary, and commonly understood meaning." Alabama Farm Bureau Mutual Casualty Ins. Co. v. Cityof Hartselle, 460 So.2d 1219, 1223 (Ala. 1984). An "outcome" is "[a] natural result, consequence." The American HeritageDictionary of the English Language 932 (1969). It is "something that comes out of or follows from an activity or process."Webster's Third International Dictionary 1601 (1971). We construe the term "outcome of a sports event" as used in Alabama Code 1975, § 13A-11-143, and in connection with a football game to mean the final score of the game. Observing the previously stated rules of statutory construction, and there being no indication that the Alabama Legislature intended otherwise, we do not interpret the term "outcome of a sports contest" to include the playing statistics of any individual football player.
The State argues that the prosecution sufficiently proved Abernethy's criminal intent under two different theories. Under the first theory, the State maintains that evidence of intent was supplied by the fact of Abernethy's knowledge of the N.C.A.A. rules prohibiting the professionalization of athletes:
 "Appellant thus intended for Porter to play, even though ineligible, and reaffirmed this intention with every payment made thereafter. As a direct result of Appellant's actions, Auburn University did play an ineligible player the entire regular season and, consequently, each of those games were [sic] subject to forfeiture under NCAA rules. Abernethy was aware of these rules and obviously was aware of the risk of forfeiture of these games. He clearly intended for Auburn University to play an ineligible player, which act in turn created the possible result of an automatic loss through forfeiture of each game of that particular season. This may have not been the intended consequence, but it was certainly a possible consequence of the Appellant's intended act." Appellee's brief at 18.
The unreasonableness of this theory is apparent in its very statement. Pursuant to the law under which Abernethy was prosecuted, it was not a criminal offense to intend for Auburn to play an ineligible player unless there also existed an intent to thereby influence the final score of the game. Without the specific criminal intent of the statute, even an intentional violation of the N.C.A.A. rules resulting in a player being declared ineligible does not constitute the offense of tampering with a sports contest. "It makes no difference if it does appear that appellant's conduct primarily was the cause of the unfortunate occurrence, for the law does not countenance the conviction of any person for an offense not contemplated, intended, or committed by him, and of which he had no knowledge *Page 189 
that the offense was about to be committed." Rogers v. State,23 Ala. App. 149, 150, 122 So. 308 (1929).
The State's first theory is based on possibility, speculation, and unfounded conjecture and is not based on a legitimate inference from the evidence. See Orr v. State,32 Ala. App. 77, 79-80, 21 So.2d 574 (1945). "An inference can be drawn only from facts, and mere possibilities will not sustain a legitimate inference." Rungan v. State, 25 Ala. App. 287, 288,145 So. 171 (1932). "[T]he possibility that a thing may occur is not alone evidence even circumstantially, that the thing did occur." Parker v. State, 280 Ala. 685, 691, 198 So.2d 261
(1967). "[N]o rule is more fundamental or better settled than that convictions cannot be predicated upon surmise, speculation, and suspicion to establish the accused's criminal agency in the offense charged." Benefield v. State, 286 Ala. 722,724, 246 So.2d 483 (1971).
The second theory advanced by the State to prove Abernethy's intent is found in Abernethy's offer "to 'purchase' additional interceptions with a reward of bonus money for such achievements." Appellee's brief at 19. In a brief filed with this Court by the Attorney General "to clarify the State's position on the legal issues raised at oral argument," the State argues:
 "The most apparent evidence of his intent is that he promised to give 'incentives' of $100.00 to Porter for each interception he made. (R. 310). The Defendant told Chris Mortenson that he provided these 'incentives' to give him an advantage over other agents and added that he should benefit from these plays as the N.F.L. teams do. (R. 252). Essentially, the Defendant was purchasing interceptions or glamour plays, to increase Porter's and his other client's draft value, thus increasing the money he would receive upon Porter's signing an N.F.L. contract."
This theory must also fail because, like the first theory, it simply does not support a legitimate inference that Abernethy intended to influence the outcome of a sports contest. If anything, this theory, also like the first, shows that Abernethy intended for Porter to play every game and that having Porter declared ineligible would be against Abernethy's own financial interest and frustrate the very purpose of the agent contract.
Not only did the State fail to prove that Abernethy had the requisite criminal intent, but, as we have just indicated, the State's own witnesses proved that Abernethy had no criminal intent. In return for his representation by Abernethy and the financial inducements involved, Porter only agreed to "play ball." Porter testified that both he and Abernethy intended for him to play every game that Auburn had for the 1987 football season. Porter also testified that his contract with Abernethy had no effect on his playing performance. The record shows that Porter testified as follows on cross-examination by defense counsel:
 "Q. Kevin, let me ask you this: Suppose you had never met Jim Abernethy, and suppose that you had never had any dealings at all with any kind of sports agent, wouldn't you have done your very best in every game that you played with Auburn University in 1987?
"A. Definitely.
 "Q. Did you in fact, play your very best in every game that you played for Auburn University?
"A. Yes, I did.
 "Q. And wasn't that exactly what you and Jim Abernethy wanted?
"A. Yes.
 "Q. So, then Kevin, wouldn't it be true, that the contract that you signed with Jim Abernethy did not hurt your performance in any of the Auburn football games?
"A. Not at all.
"Q. You still did your best, didn't you?
"A. Very best.
 "Q. In fact, the contract that you signed with Abernethy Sports had no effect, whatsoever, on your game play performance, did it?
"A. None." *Page 190 
"Intent, we know, being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence."Pumphrey v. State, 156 Ala. 103, 47 So. 156, 157 (1908). However, "[i]ntent can only be shown by facts and circumstances from which the jury is authorized to draw the inference." Burkv. State, 22 Ala. App. 107, 108, 114 So. 71, cert. denied,216 Ala. 655, 114 So. 72 (1927). "There must be a guilty scienter before a defendant can be convicted of crime, and this must be established by the evidence beyond a reasonable doubt." Talbotv. State, 23 Ala. App. 559, 560, 129 So. 323 (1930). "It is very true that to constitute a crime, there must be both an act and an intent." Hoover v. State, 59 Ala. 57, 60 (1877). "[I]ntent . . . mean[s] the state of mind of any person at the time he does the act — the act together with such state of mind constituting the charged crime." Whiddon v. State, 53 Ala. App. 280,285, 299 So.2d 326 (1973). "A wrongful act and a wrongful intent must concur, to constitute what the law deems a crime."Johnson v. State, 32 Ala. App. 217, 219, 24 So.2d 228 (1945).
In determining whether circumstantial evidence is sufficient to support a conviction, "the basic question must be whether or not the evidence adduced is consistent with guilt and inconsistent with any reasonable hypothesis that the [defendant] is innocent." Ex parte Williams, 468 So.2d 99, 102
(Ala. 1985). "[I]f circumstantial evidence fairly permits an inference consistent with innocence, it will not support a conviction." Tanner v. State, 291 Ala. 70, 71, 277 So.2d 885
(1973).
We will not belabor the point. We have examined the evidence under the principles stated in Cumbo v. State, 368 So.2d 871
(Ala.Cr.App. 1978), cert. denied, Ex parte Cumbo, 368 So.2d 877
(Ala. 1979), and Dolvin v. State, 391 So.2d 133 (Ala. 1980), for reviewing convictions based on circumstantial evidence, and conclude that the evidence presented by the State was insufficient to afford the jury any reasonable inference that the crime of tampering with a sports contest had been committed.
The fundamental reason why Abernethy's conviction must be reversed is because the crime of tampering with a sports contest was obviously not intended to and does not, embrace the agent contract type of situation involved in this case. Even the trial judge recognized this when he stated, in response to defense counsel's motion for a judgment of acquittal made at the close of the State's evidence,: "[I]t's obvious to me that these statutes have been stretched to almost the breaking point in order to try to embrace the Defendant's conduct within the four corners of these statutes. And I have some doubts as to whether or not any one of these statutes apply [sic]."
By remarkable coincidence, on August 3, 1987, the same day Porter signed the contract with Abernethy, the Alabama Athlete Agents Regulatory Act of 1987 became effective. Alabama Code 1975, §§ 8-26-1 through -41 (1988 Cumulative Supplement). Although this act was designed to control and regulate the activities of sports agents, it does not specifically prohibit or make criminal the making of a sports contract with a student-athlete. See Alabama Code 1975, § 8-26-23 ("The contract shall contain in close proximity to the signature of the athlete a notice in at least 10-point type stating that the athlete may jeopardize his or her standing as an amateur athlete by entering into the contract."). The act does provide that "[a]ny and all contracts to be utilized by athlete agents shall be on a form approved by the commission." Alabama Code 1975, § 8-26-22.
Under the provisions of the act, "[n]o person shall engage in or carry on the occupation of an athlete agent either within the state or with a resident of the state without first registering with the [Alabama Athlete Agent Regulatory] commission." Alabama Code 1975, § 8-26-4. The act does provide that the Commission may refuse to grant, revoke, or suspend the registration of any athlete agent applicant who "[h]as engaged in conduct which violates or causes a student-athlete to violate any rule or regulation promulgated by the National Collegiate Athletic Association governing student-athletes and their relationship with *Page 191 
athlete agents." Alabama Code 1975, § 8-26-7(a)(4), § 8-26-8. A violation of any provision of the act constitutes a Class C felony "punishable by a fine of not more than $5,000.00 or imprisonment for a period of not less than one year nor more than 10 years, or both." Alabama Code 1975, § 8-26-41.
We are not called upon to decide, and we make no indication of, whether Abernethy was guilty of violating any of the provisions of the Alabama Athlete Agents Regulatory Act. We do conclude and hold that the State utterly and completely failed to prove that Abernethy tampered with a sports contest with the criminal intent to influence its outcome. Because the State had the opportunity but failed to develop a case that warranted submission to a jury, this case must be reversed. Because this reversal is the result of an insufficiency of the evidence, the Double Jeopardy Clause prevents Abernethy's retrial. Burks v.United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). Cf. Zinn v. State, 527 So.2d 148 (Ala. 1988); Ex parte Beverly,497 So.2d 519 (Ala. 1986).
The judgment of the circuit court is reversed and this cause is rendered.
REVERSED AND RENDERED.
All Judges concur.