The appellant, Arthur James Smiley, was convicted for the murder of Beatrice Brown and was sentenced to 20 years' imprisonment. Four issues are raised on this appeal from that conviction.
 I
The appellant contends that the trial court erred in denying his motion for a judgment of acquittal.
Although the State's evidence against the appellant was entirely circumstantial and very weak, we find it barely sufficient to support the verdict of the jury. That evidence can be summarized as follows:
In July 1991, the victim, Beatrice Brown, was living with the appellant's brother, William Smiley, in a rental house located at 1411 12th Avenue North, in Birmingham, Alabama. The victim's sons, Eddie Jones and Tim Jones, also lived in this house, although Tim Jones was away from home for the summer. The victim and William Smiley had been living together for approximately six years at this time.
On Saturday, July 20, 1991, William Smiley called the appellant at the appellant's home in Vincent, Alabama, and asked the appellant to come visit him and the victim. The appellant arrived at the 12th Avenue house sometime that afternoon. He, William, and the victim sat on the front porch talking and drinking beer and whiskey. Eddie Jones, the victim's 24-year-old son, joined them for awhile, then left the house around 6:00 p.m.
Jones testified that he returned to the 12th Avenue house around 11:00 p.m. No one else was at the house at that time. Jones watched television until around 12:00, then went to his bedroom which was located at the rear of the house, closed the door, and went to sleep. Jones stated that around 2:00 a.m., he "woke up for a minute because [he] heard music in the living room." R. 108. He did not hear anyone speak and he went back to sleep without investigating.
Jones testified that he woke up again about 8:00 a.m. He observed that the bed in the bedroom shared by the victim and William was made. In the living room, he found the victim lying on the floor by the couch. The victim was lying on her back, with her arms out and "one leg straight and the other one cocked up." R. 117. She was wearing only a blouse, which was pulled up over her breasts. A pair of panties was around one ankle. Jones stated that he first thought the victim was only asleep, then he realized that she was not breathing. He telephoned Emergency 911 and requested assistance, *Page 1076 
then pulled the victim's blouse down, put the panties on her, and placed her on the couch.
According to Jones, when the paramedics arrived, they "laid [the victim] on the floor and tried to help her," but they were unsuccessful. R. 90. After the paramedics left and the victim's body had been removed from the house, Jones looked for the victim's purse. He testified that the purse "wasn't where it was supposed to be in by the bed and [that he] found it in the hall closet where the towels [were]." R. 93. Jones stated that he found no money in the purse or in the house. According to Jones, there was nothing to indicate that anyone had broken in, as the "doors and everything w[ere] locked." R. 116.
William Smiley testified that between 7:00 and 8:00 p.m. on the evening of July 20, he, the appellant, and the victim left the 12th Avenue house in the appellant's car. They drove to a "shot house" in Ensley where they continued to drink. William stated that around midnight he wanted to go home to get some rest because he had to work the next day. The victim did not want to leave the shot house at that time. William said that he gave the victim a $100 bill, then he and the appellant left the shot house. The appellant offered to come back later to take the victim home, but William told the appellant not to, that "one of the people will bring her home." R. 231.
The appellant was having problems with the radiator on his car and on the way back to the 12th Avenue house the brothers stopped at a service station to add water to the radiator. According to William, they arrived at the 12th Avenue house between 12:00 and 12:30 a.m. There was a group of young men, one of whom was Alfonso Simmons, on the street near the house when they arrived. William stated that he spoke to these young men and that the appellant asked, of "no one in particular," "what's more important, a hundred dollars or your life?" R. 233. He testified that he then went into the house and the appellant left. William went to the bathroom and checked around the house. He did not see anyone else in the house and left shortly thereafter. He testified that he went to the house of some friends for a while. Upon leaving his friends' house, he "ran up on a lady friend" and they went to the Tourway Inn on 6th Avenue North where they spent the rest of the night. R. 235.
On cross-examination, William denied that he and the victim had had a "big argument" about leaving the shot house, but acknowledged that there had been a "slight disagreement" over the matter. R. 258, 259. The appellant was not involved in this disagreement. William stated that he did not attempt to conceal the $100 bill when he gave it to the victim.
William described the victim as "[k]ind of weak" or "fragile" and said that she was "a woman of temper." R. 330. He denied ever having questioned the appellant as to whether the appellant had been intimate with the victim or having entertained such suspicions. He further stated that he had "[n]ever had words with" the victim concerning the appellant. R. 278. William did not know of any reason for the appellant to kill the victim and stated that he had never known the appellant to argue with the victim.
Alfonso Simmons, who was 19 years old at the time of the trial, testified that he lived with his father in an apartment building next door to the house occupied by William Smiley and the victim. Simmons stated that he knew the appellant from the appellant's visiting William. In the early morning hours of July 21, Simmons was sitting on the hood of his father's car, which was parked in front of their apartment, talking with approximately seven other young men. He observed the appellant and William drive up in front of William's house and get out of the car. Simmons stated that the appellant and William were about 10 feet away from where he was sitting. They were drinking beer and arguing. The appellant asked the entire group, "What would you rather have, a hundred dollar bill or your life?" R. 130. According to Simmons, William "throwed down a beer can and said both of them." Id. William then went into the house he shared with the victim and the appellant drove off. Simmons stated that William came back out of the house about ten minutes later and left "through the alley way." R. 131. Simmons *Page 1077 
did not see William again until much later that morning, after the paramedics had left the 12th Avenue house with the victim's body.
At some point, all of the persons gathered near Simmons' apartment left, except Simmons and Mike Williams, who both spent the night at the Simmons' apartment. According to Simmons, sometime after William Smiley left the 12th Avenue house, a car drove up and the victim got out. The man driving this car waited until the victim was in the house, then drove off. Simmons and the victim spoke briefly as she walked toward her house. Simmons stated that after the victim came home, the appellant returned to the 12th Avenue house. While he was standing on his own front porch, Simmons observed the appellant and the victim sitting on the screened front porch of the 12th Avenue house. The appellant and the victim were "talking loudly," but Simmons could not hear what they were saying and did not know if they were arguing. R. 210. After "watching them talk for a little while," R. 205, Simmons went into the front room of his apartment to watch television. From the window of that room he was able to continue to observe the appellant and the victim on the porch of the 12th Avenue house.
Simmons testified that at some point he went to his bedroom, which was at the back of the apartment, and went to sleep. At "about 7:20" on the morning of July 21, he was awakened by "a boom sound." R. 137. He left his room, went through the apartment, and out onto his porch. Simmons stated that he saw the appellant standing on the porch of the 12th Avenue house talking on the telephone. Simmons then went back in his apartment and did not come out again until the paramedics arrived.
Simmons acknowledged on cross-examination that he was not a good judge of either distance or time.[1] While his testimony on direct and cross-examination varied as to the time each of the above events occurred, he never wavered as to the basic sequence of those events. He stated that he woke his father up at 3:00 a.m. so that his father could go to work, and he indicated that the victim came home at some time after he woke his father. Simmons also stated on cross-examination that the appellant was wearing black and white clothing, with no green on it. He testified that he did not know what William Smiley was wearing. Simmons said that the "boom sound" that awakened him "[s]ounded like a gunshot," R. 211, but that he did not "ever find out what the boom sound was." R. 221.
Simmons estimated the distance between his apartment building and the victim's house to be about 14 feet. Birmingham police evidence technician Robert Person measured the distance from wall to wall of the two buildings and testified that the distance was 24 or 27 feet. R. 379.
Birmingham Police Detective Andre Pressley testified that he and Sergeant Roger Harrison interviewed the appellant "a couple of days after the incident." R. 335. An audio tape of this interview was played for the jury. During this interview the appellant stated that he went to his brother's house on July 20, then he, his brother, and the victim went, in his car, to a "lounge." The appellant told the officers that, while they were at the lounge, his brother "kind of got upset at [the victim]," but that he had "stayed out of that" and did not know what his brother was upset about. C.R. 73. Sometime after midnight his brother wanted to leave the lounge and the appellant agreed to take him home. The appellant stated during the interview that although he attempted to persuade her to do so, the victim would not leave with them and he told her that he would come back to take her home.
The appellant told the officers that his car had overheated on the way to his brother's house and they stopped at a gas station to put water in the radiator. During the drive, his brother had said that he had given the victim $100. According to the appellant, this *Page 1078 
prompted a discussion in which he told his brother that life was more important than money: "[W]hat I told him was, 'Money is not important.' I said, 'You got a hundred dollars in this hand, you got life in this hand, which is important?' " C.R. 76.
The appellant stated during the interview that he let his brother out at the 12th Avenue house, then got on the interstate. His car overheated again and he exited the interstate and looked for a service station, but there were none open. He told the officers that he made it to a motel in Woodlawn that was across the street from a Waffle House. The appellant said he went to the Waffle House, where he obtained change for a $5 bill, and then called his wife. He did not recall what time he called his wife, but "it was late." C.R. 75.
According to the appellant, he put some water in his radiator, then got on Highway 280. The car overheated again and he pulled into a gas station that was closed and spent the night there. The appellant told the officers that he called his wife again from the gas station, but that she had already left for work and that he got the answering machine. He made this call collect because he "only had one quarter." C.R. 79. When the gas station opened, the appellant made some repairs to his car, then went to his house, arriving around 10:00 a.m.
The appellant denied returning to the 12th Avenue house after dropping his brother off and stated that there was "[n]o way, exactly, absolutely" that he was on the front porch of that house at 7:00 a.m. on Sunday. C.R. 78-79. He also told the officers that he was wearing fluorescent green "jam" shorts and a white T-shirt on the night in question. C.R. 75.
After the taped interview was played for the jury, Detective Pressley testified that, after talking with the appellant, he tried to locate a Waffle House in Woodlawn that was across the street from a motel, but that he was unable to find one. Pressley also stated that he talked to William Smiley after the murder and that he was able to verify William's whereabouts on the night of the murder.
On cross-examination, Detective Pressley testified that while William's name was on the register of the Tourway Inn, there was no time of arrival noted on the register. He acknowledged that someone else could have signed in using William's name and that William might have signed the register, then left the motel. Detective Pressley also acknowledged that the neighborhood in which the victim lived was a "high crime area." R. 355-56.
The State introduced telephone records for the appellant's residence through the testimony of Beverly Danil, the assistant staff manager in the security department of South Central Bell. Ms. Danil testified that the telephone records contained charges for a collect call made to the appellant's residence from Selma, Alabama, on July 21, 1991, but contained no charges for a collect call made to the appellant's residence from Birmingham. She acknowledged on cross-examination that she did not have a record of local calls made to the appellant's residence that day.
Dr. Gary Simmons, a forensic pathologist, testified that he performed an autopsy on the body of the victim on July 21, 1991. The victim had a fracture in the cartilage of her trachea, hemorrhaging in her neck muscles, and hemorrhaging in the whites of both eyes, leading Dr. Simmons to conclude that the cause of her death was strangulation. Dr. Simmons stated that the victim's blood alcohol level was .235%, which indicates a "significant degree of intoxication." R. 301.
On cross-examination, Dr. Simmons stated that manual strangulation "obviously takes pressure, takes force," although he refused to speculate as to how much time it might have taken the killer to strangle the victim. R. 319. Dr. Simmons was not asked by either the prosecution or the defense to estimate the time of the victim's death.
Vaginal, oral, and anal swabs were taken during the autopsy of the victim and microscopic slides were prepared from these swabs. Phyllis Roland, a forensic serologist, testified that she analyzed the swabs and slides along with a sample of the appellant's blood. Semen present in the vaginal swabs and slides was consistent with the appellant's *Page 1079 
DQ alpha blood type and also with that of 1 out of every 15 black males. She acknowledged on cross-examination that she could not say that the semen found in the victim's body was the appellant's.
The appellant presented an alibi defense. He testified that, contrary to what he had told the police officers, he had returned to the 12th Avenue house after the victim returned from the shot house. According to the appellant, they sat on the front porch and talked for a while, then went into the living room and had sex on the couch. The appellant maintained that the victim was fully dressed and alive when he left her house around 1:30 a.m.
The appellant stated that, just before he left the victim's house, he called his wife and told her that he was on his way home. After he got on the interstate, his car overheated and he took the airport exit and coasted to the Holiday Inn near the exit ramp. The appellant testified that he went to the Waffle House across the street to get change so that he could call his wife. During his conversation with her, he asked her what time it was and she told him that it was 2:30. He stated that he then put water in his radiator and went to the residence of Audrey Stewart in Woodlawn. The appellant testified that he spent the remainder of the night at Ms. Stewart's. The appellant stated that he not given the police an entire account of what transpired that night because he wanted to protect the victim's reputation as well as his own.
The appellant also testified that he had been accosted a week or two after the murder by Eddie Jones and others, some of whom were armed with handguns, who accused him of murdering the victim. The appellant stated that he was taken by these people to Eddie Jones' grandmother's house and then to Audrey Stewart's house. After Ms. Stewart told Eddie Jones and his companions that the appellant had been with her on the night of the murder, they released the appellant.
Audrey Stewart and her brother, James, who resided with her, corroborated the appellant's alibi testimony. Both testified that the appellant was at their house on a Saturday night/Sunday morning in July, but they acknowledged on cross-examination that they could not specify that it was the night of July 20. James testified that the appellant arrived at the Stewart residence around 3:00 a.m. Audrey testified that she had sex with the appellant and that he remained at her house until 9:30 or 10:00 a.m. Both Audrey and James testified that the appellant was wearing green and white clothing at the time.
Audrey and James Stewart also testified that, approximately a week after the appellant spent the night at their house, the appellant and some "boys," two of whom were armed, came to their house. James stated that the "boys" asked him if he had seen the appellant on July 21 and he told them that he had. Audrey testified that she told the "boys" that the appellant had been at her house on the previous Saturday night.
Eddie Jones was recalled by the defense. He stated that he and two of his brothers had talked to the appellant and had gone with the appellant to Audrey Stewart's to talk to her about what had happened the night his mother was murdered. However, he stated that this took place a month after his mother's murder. He also testified that there was a telephone in the 12th Avenue house that would reach to the front porch.
Alfonso Simmons was recalled by the defense and testified that he was currently on probation from a conviction for possession of a firearm. He also stated that he had been convicted of a drug offense for which he had been granted youthful offender status by the judge presiding over the appellant's trial. Simmons said that he did not want to go back to prison and that Detective Pressley could "put [him] there." R. 549-50. He denied that he was "trying to help [him]self with Detective Pressley" by testifying against the appellant, although he acknowledged that he "hope[d] it helps." R. 548.
On cross-examination by the prosecutor, Simmons stated that neither Pressley nor anyone else had promised him anything or offered him anything in exchange for his testimony. He maintained that he was "telling the truth of what [he] saw." R. 548. *Page 1080 
Phyllis Roland, the forensic serologist, was also recalled by the defense. She testified that she had analyzed a blood sample taken from the appellant's brother, William Smiley, and that William had the same DQ alpha blood type as the appellant.
The appellant's wife, Carolyn Smiley, testified that she received two telephone calls from the appellant on the night in question, one between 1:00 and 1:30 a.m., and the other between 2:00 and 5:00 a.m. She stated that the appellant told her in the first call that he was at the victim's house.
The State presented a brief rebuttal, recalling Eddie Jones and Detective Pressley. Jones reiterated that he and his brothers had talked to the appellant and Audrey Stewart about a month after the murder. Detective Pressley testified that he had interviewed Carolyn Smiley after the murder. According to Pressley, Mrs. Smiley told him that the appellant had called her twice on the night of July 20, once between 2:00 and 3:00 a.m. and once about 3:00 or 4:00 a.m. Pressley also stated that Mrs. Smiley told him that the appellant had said during the first call that he was at the victim's house.
 A
The appellant made a motion for judgment of acquittal after the close of the State's case-in-chief and renewed this motion after the State's rebuttal evidence. In determining whether the evidence is sufficient to support the appellant's conviction, we can consider only the evidence that had been presented at the time the appellant originally made his motion for judgment of acquittal. See Lewis v. State, 535 So.2d 228, 236
(Ala.Cr.App. 1988); Payne v. State, 487 So.2d 256, 261
(Ala.Cr.App. 1986). "Further, . . . we must view the circumstantial evidence in the light most favorable to the prosecution," Ex parte Bailey, 590 So.2d 354, 357 (Ala. 1991), and in conformity with the other principles set forth in Exparte Mauricio, 523 So.2d 87, 91-93 (Ala. 1987), Dolvin v.State, 391 So.2d 133, 137-38 (Ala. 1980), White v. State,546 So.2d 1014, 1016-18 (Ala.Cr.App. 1989), and Cumbo v. State,368 So.2d 871, 874-75 (Ala.Cr.App. 1978), cert. denied,368 So.2d 877 (Ala. 1979).
There is no question that the State established that the victim met her death through the deliberate and intentional acts of another, thereby establishing the statutory elements of the offense of murder. See Ala. Code 1975, § 13A-6-2(a)(1). The question in this case is whether the State presented sufficient evidence from which the jury could properly conclude that the appellant was the perpetrator of this offense.
During the discussion on the appellant's motion for a judgment of acquittal, the trial court stated several times that "this is a very close case." R. 433, 434. The parties and the court briefly summarized the evidence that had been presented, with the prosecutor asserting that "the State bottoms the case essentially on he was the last person seen with her." R. 435. The court denied the appellant's motion, stating, "I am going to give it to the State, but it is very close." R. 437.
We agree with the trial court that it is a very close case. Applying the principles set forth in Ex parte Mauricio, 523 So.2d at 91-93, Dolvin v. State, 391 So.2d at 137-38, White v.State, 546 So.2d at 1016-18, and Cumbo v. State, 368 So.2d at 874-75, we find that the State's evidence is sufficient, but only minimally so, to support the appellant's conviction.
The most damning evidence presented by the State was clearly the testimony of Alfonso Simmons, who placed the appellant at the victim's house some 40 minutes before her body was discovered.[2] This testimony alone, however, would not support the appellant's conviction: *Page 1081 
 " 'The mere presence of a person at the time and place of a crime is not sufficient to justify his conviction for the commission of the crime.' Dolvin v. State, 391 So.2d 129, 133
(Ala.Cr.App. 1979), reversed [as to outcome], 391 So.2d 133 (Ala. 1980). However, 'if presence at the time and place a crime is committed, in conjunction with other facts and circumstances, tends to connect the accused with the commission of the crime, then the jury may find the accused guilty.' Dolvin [v. State], 391 So.2d [133, 137 (Ala. 1980)]."
Payne v. State, 487 So.2d 256, 261 (Ala.Cr.App. 1986). AccordCaulton v. State, 500 So.2d 1316, 1317 (Ala.Cr.App. 1986).
In this case, the position of the victim's body when she was found and her state of undress indicate that she was killed while or shortly after engaging in sexual activity. Semen present in her body was consistent with the appellant's DQ alpha blood type. While this evidence must be characterized as very weak, it does serve to connect the appellant with the murder. The State also presented evidence that the investigating officer was unable to confirm that the appellant was where he claimed in his statement to the officers to have been on the night of July 20.[3]
Again, the sum of the testimony pointing toward the appellant's guilt is extremely weak. It is, however, minimally sufficient to support the appellant's conviction. As we have repeatedly stated when reviewing convictions based on circumstantial evidence: " 'It is not necessary for the circumstances to be "such as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused." ' " White v. State, 546 So.2d at 1022 (quoting Mitchell v.State, 114 Ala. 1, 6, 22 So. 71, 72 (1897)).
 " '[T]he standard utilized by this Court is not whether in our opinion the evidence and all reasonable inferences therefrom failed to exclude every hypothesis other than guilt, but rather whether there was evidence from which the jury might reasonably so conclude.' "
Cumbo v. State, 368 So.2d at 875 (emphasis added).
During the discussion of the appellant's motion for judgment of acquittal, the trial court noted two cases in expressing his concern over the sufficiency of the State's evidence:Weathers v. State, 439 So.2d 1311 (Ala.Cr.App. 1983), andJohnson v. State, 594 So.2d 1245 (Ala.Cr.App. 1991), cert. denied, 594 So.2d 1252 (Ala. 1992). In Weathers, the State's evidence showed only
 "that the [defendant] was the last person to see the deceased alive, that the deceased was killed with the family gun and [that] the [defendant] gave inconsistent statements about this gun, and that the [defendant] had wanted to move out of the deceased's house some five or six months prior to the murder because the deceased dipped snuff."
439 So.2d at 1317. We held that this evidence was not sufficient to support the defendant's conviction because it "created no more than mere suspicion or conjecture that this [defendant] killed the deceased." Id. In Weathers, however, the defendant lived in the same house as the deceased, who was the defendant's mother-in-law. The defendant testified that she had left the deceased alone in the house in the middle of the afternoon when she and her young son went to pick up her husband from his place of employment. When the defendant and her husband returned to the house an hour or so later, they found the body of the deceased.
The evidence in the present case is somewhat stronger. The appellant was seen in the early morning hours with the victim on the front porch of her residence, where he did not live. He was again seen on the victim's front porch only 40 minutes before her body was discovered. The position of the victim's body and her attire suggest that she had engaged in sexual intercourse either immediately before or was engaging in sexual *Page 1082 
intercourse at the time of her death. The appellant's DQ alpha blood type is consistent with the semen found in the victim's body. While this evidence is not substantially different from or significantly stronger than the evidence inWeathers, there is at least enough additional evidence in this case to place the appellant's guilt beyond "mere speculation or conjecture" and to warrant sending the case to the jury.
In Johnson v. State, the defendant was convicted for the murder of his wife, who was stabbed to death in the couple's home. The defendant, who was white, contended "that a black individual or individuals somehow gained entrance to his home, [and] possibly raped, murdered and robbed his wife." 594 So.2d at 1251. This Court stated that the defendant's contention was "a reasonable theory supported by [the following] substantial evidence":
 "[T]he Negroid hair found clutched in the victim's hand, as well as the other Negroid hairs found in the vicinity of the body; the missing valuables; the evidence that the victim had sperm in her vagina which was not of the same type as that of the [defendant]; the evidence of a black stranger having been seen in the vicinity of the [defendant's] house earlier in the day; the fact that, even though the evidence showed a violent assault and a struggle, the [defendant] had no scratches, bruises, or blood on him when he was observed shortly after the crime was committed; and the evidence supporting the fact that the [defendant] worked at his job from 10:00 p.m. to 2:00 a.m."
594 So.2d at 1251-52. We reversed the defendant's conviction, concluding that this evidence, even when considered with the State's evidence of threats and motive, was not sufficient to exclude "all other reasonable hypotheses except that of [the defendant's] guilt." Id. at 1252.
In the present case, there was not "substantial evidence" that someone else committed the crime. While the forensic serologist testified on direct examination that the semen found in the victim's body was consistent with the blood type of 1 out of every 15 (6.67%) black males, as well as with the appellant's blood type, it was the appellant who was seen on the victim's front porch shortly before her body was discovered. When recalled by the defense, the serologist testified that William Smiley's DQ alpha blood type was the same as the appellant's. Therefore, it may be inferred that the semen found in the victim's body was also consistent with William's blood type. However, there was no positive evidence contradicting William's testimony that he spent the night at the Tourway Inn. In fact, William's testimony is supported by Detective Pressley's testimony that William's name was on the motel's register showing him as a guest on the night of the murder.
To repeat, while the State's evidence is extremely weak, it is minimally sufficient for the jury to have reasonably excluded every hypothesis but that of the appellant's guilt. That is all that is required.
 B
The appellant makes much of the fact that Alfonso Simmons' testimony was uncorroborated. He also attacks Simmons' credibility as a witness.
Simmons was clearly not the appellant's accomplice. Consequently, there was no need for his testimony to be corroborated in any manner. See Ala. Code 1975, § 12-21-222, providing that a felony conviction cannot be had upon the uncorroborated testimony of an accomplice. It is well settled that "[a] fact may be established as firmly by the testimony of one witness as by the testimony of an entire community."Shelton v. State, 382 So.2d 1175, 1177 (Ala.Cr.App. 1980). Accord Thompson v. State, 376 So.2d 761, 764 (Ala.Cr.App.), reversed on other grounds, 376 So.2d 766 (Ala. 1979); Stoudemirev. State, 365 So.2d 376, 379 (Ala.Cr.App. 1978).
We note that the circumstances of Stoudemire v. State are somewhat similar to the circumstances in this case. Stoudemire
involved a prosecution for larceny in which a single eyewitness identified the defendant as the companion of a man who had come to her house to obtain a coat hanger. She testified that while the defendant watched from the corner of the building next door, his companion *Page 1083 
used the coat hanger to open the door of a car parked near the building, then removed something from the car. The two men left the scene together. In holding that the State's evidence was sufficient to support the defendant's conviction, we noted that while there were inconsistencies and some confusion in the eyewitness' testimony, she never wavered on her identification of the defendant as one of the perpetrators. 365 So.2d at 378.
Similarly, in the present case, although there were inconsistencies and some confusion over specific times in Simmons' testimony, he never wavered in his rendition of the basic sequence of the events occurring in the early morning hours of July 21 or in his identification of the appellant as the person he saw on the victim's porch shortly before her body was found. In any event, " '[t]his Court cannot pass upon the credibility of witnesses.' " Clemmons v. State, 459 So.2d 997,998 (Ala.Cr.App. 1984) (quoting Grimes v. State, 24 Ala. App. 419,136 So. 485 (1931)). The credibility of Simmons' testimony was a matter within the sole province of the jury. Brown v.State, 588 So.2d 551, 559 (Ala.Cr.App. 1991); Gurganus v. State,520 So.2d 170, 173 (Ala.Cr.App. 1987). The inconsistencies and confusion in his testimony, as well as his prior convictions and his status as a probationer, were merely matters for the jury to consider in determining what credence to give Simmons' testimony. See Neal v. State, 460 So.2d 257, 261
(Ala.Cr.App. 1984) (vagueness and inconsistency of testimony are matters affecting credibility); J. Colquitt, Alabama Law ofEvidence § 6.7 (1990) ("[t]he purpose of impeachment is to discredit the credibility of the witness, thereby inducing the fact-finder to give less weight to the witness' testimony");Id. § 6.8 ("evidence of a witness' . . . bias generally is admissible to discredit the witness' credibility or to devalue his or her testimony").
 C
In his brief, the appellant makes many arguments that are actually directed at the weight of the evidence, rather than at the sufficiency of the evidence.
 "We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. E.g., Franklin v. State, 405 So.2d 963, 964 (Ala.Cr.App.), cert. denied, 405 So.2d 966 (Ala. 1981); Crumpton v. State, 402 So.2d 1081, 1085 (Ala.Cr.App.), cert. denied, 402 So.2d 1088 (Ala. 1981); Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, 401 So.2d 204
(Ala. 1981). ' "[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine." ' Harris v. State, 513 So.2d 79, 81 (Ala.Cr.App. 1987) (quoting Byrd v. State, 24 Ala. App. 451, 136 So. 431
(1931))."
Johnson v. State, 555 So.2d 818, 820 (Ala.Cr.App. 1989). Furthermore, the conflict between the State's evidence and the appellant's alibi evidence presented a question for the jury to resolve. Jeffers v. State, 455 So.2d 201, 203
(Ala.Cr.App. 1984); Williams v. State, 412 So.2d 1274, 1275
(Ala.Cr.App. 1982).
 II
The appellant contends that the statement he gave to Detective Pressley and Sergeant Harrison should have been suppressed because (1) he was "harassed and coerced into coming" to talk to the officers; (2) he "was the prime and only suspect when he was coerced to come" talk to the officers; and (3) he "was subject[ed] to custodial interrogation but was not given Miranda protection." Appellant's brief at 9.
At the suppression hearing held immediately before trial, Detective Pressley testified that he and Sergeant Harrison had interviewed the appellant at 10:45 a.m. on July 26, 1991. Earlier that morning, Pressley had telephoned the appellant's place of employment and had left a message that he needed to speak with the appellant. Pressley stated that the appellant returned his call about an hour before coming in for the interview. At that time, Pressley asked the appellant to "come down and talk with [him] about the case," and the appellant said that he would. R. 17-18.
The interview was conducted at the "Birmingham Administration Building," located at 417 Sixth Avenue South. R. 13-14. *Page 1084 
Pressley stated that he was notified of the appellant's arrival by "the desk personnel downstairs." R. 18. Pressley went to the desk area and told the appellant that he "needed to talk to [the appellant] about a case and [the appellant] needed to come with [him] upstairs." R. 19. The appellant and Pressley then went to an interview room on the third floor where they were joined by Sergeant Harrison. Pressley described the interview room as "a small room . . . about six by eight," containing "[o]ne table and three chairs." R. 14.
Pressley stated that when he met the appellant at the desk he did not arrest the appellant or "take him into any kind of custody." R. 19. He also testified that neither he nor Sergeant Harrison was armed and that they did not threaten the appellant in any way at any time. According to Pressley, the officers never told the appellant that he had to stay at the building or that he was under arrest. Pressley said that the officers did not "do anything prior" to talking with the appellant "that would have restrained his freedom of movement," R. 22, and that they did not restrain the appellant's "freedom of action" during the interview, R. 27-28. After the interview, the appellant was allowed to leave the building.
The interview with the appellant was tape-recorded and was later transcribed. The transcription of the interview was introduced at the suppression hearing. At the beginning of the interview, the following occurred:
 "Q. (Sgt. Harrison) . . . [H]ow did you get here today?
"A. In my car, my wife's car.
"Q. Your car, okay. Did you come by yourself?
"A. Yes.
"Q. You drove up here?
"A. Yes.
 "Q. How did you get notified of this interview? "A. Ah, Detective Pressley called me at work.
"Q. And he asked you to come down?
"A. Yes.
 "Q. And you voluntarily came down to give us a statement, is that right?
"A. Yes.
"Q. Okay.
 "A. But I didn't know it was going to be a statement.
 "Q. Yeah, you volunteered to come down and talk with us anyway?
"A. Yes.
 "Q. Okay, ah nobody, in other words, nobody had told you that you're under arrest or anything like that?
"A. No, sir." C.R. 72.
The interview concluded with the following questions:
 "Q. (Pressley) Ah, yeah. Anyone force you to make this statement?
"A. No, sir.
 "Q. Anyone promise you anything to make this statement?
"A. No, sir.
"Q. You made this statement on your own free will?
"A. Yes.
 "Q. Its [sic] going to end this taped statement. Time is 11 o'clock a.m." C.R. 80-81.
On cross-examination, Detective Pressley testified that he began trying to contact the appellant after he received information that the appellant had been seen at the victim's residence shortly before her body was found. He stated that he called the appellant's home several times, but that he talked only to the appellant's wife. He also called the appellant's wife at her place of employment. Pressley acknowledged that he had talked with the appellant's employer on the morning of the interview. He stated that he talked to the appellant's employer "[t]o find out his whereabouts" and "[b]ecause [he] needed to talk to the defendant again." R. 39-40. Pressley denied that the appellant was under suspicion at the time he was asked to come in for the interview. When asked if he interpreted the appellant's remark at the beginning of the interview that he did not "know it was going to be a statement" as the appellant's consent to giving the statement, Pressley replied, "My thoughts were that if he *Page 1085 
knew he didn't want to make a statement, he shouldn't have shown up." R. 46-47.
In response to questioning by the trial court, Pressley stated that the appellant "never made any equivocal request for a lawyer," and that the appellant was not arrested until October 11, 1991. R. 54.
The appellant testified at the suppression hearing that, prior to the morning of the interview, Detective Pressley had called his wife "more than four times." R. 58. He stated that Detective Pressley called his wife again the morning of the interview. His wife then called him and told him to call Pressley. He stated that he called Pressley and that Pressley asked him "to come down and talk to him." R. 57. The appellant testified that he told Pressley that he "was working," and Pressley told him "to wait there or something like to that effect." Id. According to the appellant, his "boss called [him] upstairs and told [him] a Detective Pressley talked to him and they wanted [the appellant] to go down there and talk to [Pressley]." Id.
The appellant stated that when he arrived at the Administration Building, he went to the desk, where he was told to "sit down and wait until someone came to get [him]." R. 59. Pressley appeared and took him upstairs by way of an elevator. The appellant said they went to a "little room" with "a combination lock on the door, you have to push the combination to get in and out." Id. According to the appellant, he believed that he was coming down "to talk" with Pressley, but when Pressley "pulled out his tape recorder and tape, that was a statement." R. 61. When asked by defense counsel why he did not leave at that point, the appellant replied, "I couldn't have got out anyway, they wouldn't have let me." Id.
The appellant did not dispute the contents of the transcription of the interview. He did testify that the following also occurred, although it was not in the transcript: "I asked them, I said, 'You going to read me myMiranda rights or anything?' He [Harrison] said, 'No.' So, I said, 'I can go?' He said, 'Yeah, you could have left out a long time ago.' " R. 64. Pressley then "got up and opened the door and opened the other door for [him] and let [him] onto the elevator and let [him] out." R. 65. The appellant maintained that "[w]ithout [Pressley], [he] couldn't have got out of there." R. 65. When asked by defense counsel why he did not ask for a lawyer, the appellant stated that "I didn't know I was making a statement. I thought I was just going to talk to them." R. 66.
It is uncontested that the appellant was not at any time prior to or during the July 26 interview advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966). However, Miranda warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' " Oregon v. Mathiason, 429 U.S. 492, 495,97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977).
In determining whether a person was "in custody" so as to require Miranda warnings, we "must look at the totality of the circumstances involved." United States v. Rorex, 737 F.2d 753,755 (8th Cir. 1984). Accord United States v. Hocking,860 F.2d 769, 773 (7th Cir. 1988). These circumstances include
 "whether the suspect was questioned in familiar or neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint of the suspect, the duration and character of the questioning, how the suspect got to the place of questioning, the language used to summon the suspect, the extent to which the suspect is confronted with evidence of guilt, and the degree of pressure applied to detain the suspect."
P.S. v. State, 565 So.2d 1209, 1214 (Ala.Cr.App. 1990), quoted in Landreth v. State, 600 So.2d 440, 444 (Ala.Cr.App. 1992). "[I]n order for a court to conclude that a suspect [wa]s in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such extent that he would not feel free to leave." *Page 1086 United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir. 1987).
The interview with the appellant took place at a police "administration building." The layout and actual function of this building was not physically described by either Pressley or the appellant. Compare United States v. Jorgensen,871 F.2d 725, 727 (8th Cir. 1989) ("[w]e must consider whether the FBI offices were [Agent] Oxler's innocuous bureaucratic workplace or [the defendant's] tacitly (but effectively) intimidating detention center"). However, the evidence is uncontradicted that only two officers took part in the interview. Neither officer was armed and neither threatened the appellant or subjected him to any physical force. It is also uncontradicted that the interview lasted only 15 minutes and that the appellant drove himself to the interview in his own vehicle. From the record, it appears that the tone of the interview was conversational and calm. The appellant was told that a witness had said that he had seen the appellant on the victim's front porch around 7:00 a.m. However, the appellant was clearly not accused of the murder. We also note that the appellant did not request an attorney and did not, at any time, seek to terminate the interview. See United States v. Phillips, 812 F.2d at 1362.
The evidence was in conflict as to the "language used to summon" the appellant. Pressley testified that he asked the appellant to come talk to him and that the appellant agreed to do so. The appellant indicated that his employer ordered him to go talk to Pressley. "It is well settled that the 'weight and credibility to be attached to the testimony of witnesses at a suppression hearing is a question for the trial judge.'Kitchens v. State, 445 So.2d 1000, 1002 (Ala.Cr.App. 1984). Accord, Hoskins v. State, 449 So.2d 1269, 1270
(Ala.Cr.App. 1984)." Jackson v. State, 589 So.2d 781, 784
(Ala.Cr.App. 1991). The trial court obviously found Detective Pressley's testimony more credible on this point. This credibility choice is clearly supported by the appellant's answers to the questions posed at the beginning and end of the interview.
Although the appellant was not told that he was free to go, he was not told that he was under arrest, he was not treated as though he was under arrest, and he was not handcuffed. The appellant's testimony that the interview took place in a room with "a combination lock" on the door was uncontroverted. However, in view of the numerous circumstances indicating that the appellant was not in custody during the interview, we do not find the fact that the interview took place in a locked room to be dispositive. As the South Dakota Supreme Court noted in State v. McQuillen, 345 N.W.2d 867, 869-70 (S.D. 1984), "[i]nMathiason, the [United States Supreme] Court found no custodial interrogation where the defendant went to the station house voluntarily, the questioning took place for one-half hour behind 'closed doors,' and defendant was told he was a suspect." Applying Mathiason to circumstances very similar to those in the present case, the McQuillen court concluded that "[t]he fact that the conversation occurred in a room with a self-locking door does not by itself create a custodial interrogation, just as the 'closed doors' of Mathiason did not create a custodial interrogation." 345 N.W.2d at 870. See alsoJorgensen, 871 F.2d at 727, 729 (court found that defendant was not in custody despite defendant's testimony that FBI offices where two-hour interview took place were equipped with "door buzzers, locking doors, agents with visible weapons, and other security devices").
"[A] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, seeBradley v. State, 494 So.2d 750, 760-61 (Ala.Cr.App. 1985), affirmed, 494 So.2d 772 (Ala. 1986), cert. denied, 480 U.S. 923,107 S.Ct. 1385, 94 L.Ed.2d 699 (1987), and is not to be reversed absent a clear abuse of discretion, see Harper v.State, 535 So.2d 599, 600-01 (Ala.Cr.App. 1988); Herriman v.State, 504 So.2d 353, 359 (Ala.Cr.App. 1987)." Jackson v. State, 589 So.2d at 784. We find no abuse of discretion in the trial court's denial of the appellant's motion to suppress.
 III
The appellant argues that the trial court erred in denying his motion for mistrial *Page 1087 
made after what he alleges was an unduly prejudicial comment by the prosecutor.
During the course of the prosecutor's cross-examination of the appellant, the following occurred:
 "Q. Do your remember what you [and the victim] talked about [while sitting on the front porch after returning from the shot house]? "A. I can't recall.
 "Q. Did you ask her for sex? Did you say, hey, I would like to have sex with you or something that would indicate you wanted to have sexual intercourse or intimacy with her?
"A. You're very insensitive —
 "Q. I am very insensitive, but I'm asking the questions.
 "A. What I'm saying, I'm here because I tried to keep from hurting someone else's feelings, because their mother passed away, I tried to hold all of that in.
 "MR. [JOHN] STOKESBERRY [prosecutor]: Your Honor, again, I wish you would instruct the witness to answer the question.
 "THE COURT: I think he said he didn't recall, John.
 "MR. STOKESBERRY: Your Honor, am I going to have to sit here and be lectured by this witness the rest of the trial or am I going to be able to answer and tell him the reason he is here is because he murdered somebody?
 "MR. CHESTNUT [defense counsel]: I object to that, Judge, that's for the jury — I move for a mistrial.
"THE COURT: I can't tell you —
"MR. STOKESBERRY: Well, I mean —
 "THE COURT: Let me say something to the jury, John, because no lawyer ever puts his opinions in before the jury about what he is saying.
 "MR. STOKESBERRY: My opinion is not what I am putting in.
 "THE COURT: The question you are here about is not whether this woman was assaulted and murdered, but has the State — will the State prove beyond a reasonable doubt Mr. Smiley is the killer. What Mr. Stokesberry thinks is not properly in this case any more than what Mr. Chestnut might think. We are here for your collective judgment.
 "Now, Mr. Smiley, I testified in divorce court about fees years ago and I was not a good witness, I couldn't stick to the subject. You have to stick to the subject. I know it's not easy to sit there and take these questions, but you must do this. All right, sir?" R. 662-65 (emphasis added).
This matter was discussed again during a break taken at the close of the State's rebuttal evidence. After renewing the motion for a judgment of acquittal, defense counsel stated: "We also made a motion for mistrial which Your Honor did not rule on, I don't think." The trial court responded: "No, sir, I am going to talk to the jury again about that. I deny your motion. The jury seems to take at heart my instructions about opinions of counsel." R. 736. Defense counsel then argued that the prosecutor's "stating to the jury that [the defendant] is a murderer" was "a bell that [could not] be unrung by instructions from the court." R. 737. The following then occurred:
 "THE COURT: I share your concerns and I think it is incumbent on me to try to cure these problems. I promise you [that] if I suspect the jury will not abide by my instructions, I will give you the mistrial. We all recognize that this was a mistake.
 "MR. STOKESBERRY: Well, Your Honor, you have already said it is a mistake, but I will point out that this defendant refused to answer questions even though he had been instructed. He wanted to ask me questions about why he was here. And my response was he was here because he murdered somebody.
 "THE COURT: This is an unsophisticated lay person, John, and you are a professional. I know you dropped the ball, and you know that, John.
 "MR. STOKESBERRY: If you feel that way, Judge, we can do it all over again.
 "THE COURT: Well, we will unless I am satisfied this jury can go on. I am going to hit them again with the instructions. There are a few things you have to be very careful about." R. 738-39. *Page 1088 
When the jury returned to the courtroom, the trial court explained the order in which the attorneys would make closing arguments. It then addressed the jury as follows:
 "A while ago when we were talking, you recall Mr. Chestnut made a motion for a mistrial and I got onto you pretty good about Mr. Stokesberry's comments. And I told you, I hope, unequivocally and as firmly as I can, when you are talking to nice people, that that was inappropriate. And I should have gone further and I should have asked if any of you have any problem setting that out of your mind? We have room for an alternate. If somebody feels like Mr. Stokesberry's statement might skew your judgment about this, let me know and we can make you an alternate in the case. If there are a couple or three of you that have that problem, let me know. Can everybody abide by my instructions that Mr. Stokesberry's comments were inappropriate? He just slipped up and said something that shouldn't have been said and it is inappropriate and it shall not be considered by you people as having any bearing on the issues. All right?
 "MR. STOKESBERRY: Your Honor, I don't think you told them what comment I made. I have said many things in here —
 "THE COURT: I think the jury understands exactly what I am talking about. There has only been one time that I talked to them like that, John.
 "MR. STOKESBERRY: I just wanted to make sure they knew which statement we are talking about.
 "THE COURT: Yes, sir, they do. Or at least you are saying that you do. Okay." R. 740-43.
It is never permissible for a prosecutor "to make an emphatic statement that the defendant is guilty of the crime charged,"White v. State, 294 Ala. 265, 270, 314 So.2d 857, 861-62, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975), quoted in Ex parte Baldwin, 456 So.2d 129, 136 (Ala. 1984), affirmed, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985); accord Rowland v. State, 31 Ala. App. 605, 606, 20 So.2d 881,882 (1945), or to state his opinion or belief that the defendant is guilty, Adams v. State, 280 Ala. 678, 680,198 So.2d 255, 257 (1967); Davis v. State, 494 So.2d 851, 857
(Ala.Cr.App. 1986); Sams v. State, 506 So.2d 1027, 1029
(Ala.Cr.App. 1986); Mainor v. State, 339 So.2d 147, 150
(Ala.Cr.App. 1976). In Crosslin v. State, 446 So.2d 675, 680
(Ala.Cr.App. 1983), this Court held that the prosecutor's inclusion in his questions to the defendant on cross-examination such phrases as "before you did the killing" and the prosecutor's statement that "he [the defendant] did kill them" made in response to an objection by defense counsel were "emphatic remarks" as to the defendant's guilt and were improper. Whether characterized as an "emphatic statement" as to the appellant's guilt or, as the trial court characterized it, as an opinion that the appellant was guilty, the prosecutor's statement in this case that the appellant was "here . . . because he murdered somebody," was clearly improper.
However, not every improper comment requires the granting of a mistrial. "A mistrial is an extreme measure which should be granted only when the prejudicial qualities of the comment cannot be eradicated by instructions or other actions by the trial court." Colvette v. State, 568 So.2d 319, 325
(Ala.Cr.App. 1990). In determining whether eradication is possible, "each case of improper comment must be judged on its own particular merits." Thomas v. State, 625 So.2d 1149, 1153
(Ala.Cr.App. 1992), reversed as to outcome, 625 So.2d 1156
(Ala. 1993).
In Crosslin, the trial court overruled defense counsel's objection and did not take any action to eradicate the prejudice engendered by the remarks. While this error, in addition to other errors committed by the trial court, necessitated a reversal of the defendant's conviction, we clearly indicated that the remarks made by the prosecutor in that case were eradicable:
 "The emphatic remarks by the District Attorney in the presence of the jury that appellant did kill the two victims was improper comment which resulted in prejudicial error when the trial court failed to sustain defense counsel's objection and immediately admonish the jury to disregard said comments. When defense counsel *Page 1089 
either objects to improper comment or moves to have the remark excluded, it becomes the duty of the trial judge not only to sustain the motion or objection, but to also exercise a reasonable degree of effort to eradicate its effect from the minds of the jury."
Crosslin, 446 So.2d at 680 (emphasis added).
In the present case, the trial court immediately rebuked the prosecutor for making the remark and instructed the jury that the remark was improper. Less than 90 minutes later,[4] he again instructed the jury that the prosecutor's remark was improper, explicitly stated that the remark was not to be considered by the jury, and inquired as to whether the members of the jury could disregard the remark. We think that these actions were sufficient to eradicate the prejudice engendered by the remark. Cf. Ex parte Wilson, 571 So.2d 1251, 1265 (Ala. 1990) (improper comments on defendant's failure to testify are not cause for reversal "if the trial court sustains an objection to [the] improper remarks and promptly and appropriately instructs the jury of the impropriety of those remarks") (emphasis in original); Garnett v. State, 555 So.2d 1153, 1154-55
(Ala.Cr.App. 1989) (comments or questions indicating that the defendant has committed other bad acts are not cause for reversal where the trial court takes prompt action to eradicate any prejudice from such comments or questions).
 " 'When, as here, a trial court immediately charges the jury to disregard improper remarks, there is a prima facie presumption against error. Where a trial court acts promptly to impress upon the jury that improper [remarks] are to be disregarded by them in their deliberations, the prejudicial effects of such remarks are removed.' "
Howington v. State, 568 So.2d 351, 352 (Ala.Cr.App. 1990) (quoting Woods v. State, 460 So.2d 291, 295 (Ala.Cr.App. 1984)). The fact that a portion of the trial court's curative action took place some 90 minutes after the remark was made does not lessen the effect of the totality of the court's actions. SeeBradley v. State, 577 So.2d 541, 555 (Ala.Cr.App. 1990) (curative instructions given the next day were sufficient to eradicate prejudice).
We find the present case distinguishable from Quinlivan v.State, 579 So.2d 1386 (Ala.Cr.App.), cert. quashed,596 So.2d 658 (Ala. 1991). In Quinlivan, the prosecutor stated in his closing argument that he was "not obliged to try any case that [he] d[id not] want to try" and that he was "commanded by the law of Alabama as a District Attorney to prosecute the guilty and protect the innocent." 579 So.2d at 1387 (emphasis deleted). In response to defense counsel's objection, the trial court stated only: "Of course any opinion . . . of the prosecutor, ladies and gentlemen, is not relevant. What you must determine is the guilt or innocence of the defendant based on the evidence and the law." Id. This Court held that the prosecutor's closing argument "was nothing more than a blatant statement of his personal belief in the appellant's guilt," id.
at 1389, and that the remark "was so prejudicial . . . as to deprive the [defendant] of a fair trial," id. at 1387. We observed:
 " 'The prosecutor's . . . expressing his personal opinion concerning the guilt of the accused pose[s] two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.' "
Id. at 1388 (quoting United States v. Young, 470 U.S. 1, 18-19,105 S.Ct. 1038, 1047-48, 84 L.Ed.2d 1 (1985)). *Page 1090 
The present case differs from Quinlivan in three ways. First, in our opinion, the comment in this case is not nearly as egregious as the comment in Quinlivan. The prosecutor inQuinlivan expressly referred to "the law of Alabama" and his position as district attorney in conveying his belief in the defendant's guilt. The prosecutor in this case did not make such references. Further, the comment made in this case is virtually identical to the comment made in Crosslin, which, as noted above, we indicated was eradicable. See Crosslin, 446 So.2d at 680.
Second, the circumstances under which the comments were made are very dissimilar. The comment in Quinlivan was made deliberately and directly to the jury in closing argument while the comment in the present case was made in exasperation during cross-examination of a witness. We can understand the prosecutor's frustration with the appellant's responses on cross-examination and we can appreciate the difference between deliberate remarks and those made in the heat of confronting a witness. Nevertheless, the prosecutor's comment in this case was completely improper and is to be soundly condemned. The fact that a witness is recalcitrant or uncooperative does not grant a prosecutor the right to engage in unprofessional and improper conduct.
The third, and perhaps the most important, difference between this case and Quinlivan is the disparity in the action taken by the respective trial judges. The trial judge in Quinlivan
merely indicated to the jury that the prosecutor's remark was improper; he did not expressly instruct the jury to disregard the remark nor did he question the jury as to whether it could do so. In contrast, the trial judge in the present case censured the prosecutor for making the remark, expressly instructed the jury that the remark was improper, expressly instructed the jury to disregard the remark, and questioned the jury as to its ability to follow his instructions. This is a situation where we can readily say that "the consistent actions of the trial court serve[d] to totally nullify the effect of the [comment]." Ex parte Thomas, 625 So.2d 1156, 1158
(Ala. 1993).
As the Alabama Supreme Court has made clear, "[t]he trial judge is in the best position to determine the probable effect of any comments or incidents occurring at trial," GeneralMotors Corp. v. Johnston, 592 So.2d 1054, 1059 (Ala. 1992), and the judge "must be given wide discretion in determining whether the making of a certain utterance by the District Attorney requires that a mistrial be granted," White v. State,294 Ala. at 270, 314 So.2d at 862. Under the facts presented by this case, we find no abuse of discretion in the court's denial of the appellant's motion for mistrial. See Shadle v. State,280 Ala. 379, 384, 194 So.2d 538, 541-42 (1967); Wadsworth v.State, 439 So.2d 790, 792 (Ala.Cr.App. 1983), cert. denied,466 U.S. 930, 104 S.Ct. 1716, 80 L.Ed.2d 188 (1984).
 IV
The trial court did not improperly curtail the appellant's cross-examination of Detective Pressley.
Alfonso Simmons was the second witness called by the State in its case-in-chief and Detective Pressley was its fourth witness. During cross-examination of Alfonso Simmons, defense counsel asked if all of the young men Simmons had been talking to when the appellant and William Smiley returned from the shot house saw the appellant at that time. Simmons responded, "Yes, sir." R. 176. Defense counsel then asked Simmons to name these young men. Simmons named Michael Williams and Chris Griffin, then stated, "I don't know the other boys' names." R. 176-77. As noted in Part I of this opinion, Simmons testified that Michael Williams spent the night at his apartment on the night of the murder. Other than the reference to the time the group of young men was gathered in front of the Simmonses' apartment, Simmons' testimony was somewhat confusing as to when Michael was with him when certain events occurred and when Michael was asleep in the apartment.
On cross-examination, Detective Pressley indicated that he had the names of only two of the young men gathered in front of the Simmonses' apartment — "Alfonso Simmons and a guy by the name of Michael." R. 352. On redirect examination, Pressley stated that *Page 1091 
he had "tried to find some of these other . . . men," but that "[Simmons] didn't give [him] any leads to their whereabouts, nor did [Simmons] know where Michael lived." R. 360. On recross-examination, Pressley testified that "Simmons would not tell [him] where these other boys lived." R. 361. On redirect examination, Pressley said that he had not been able to locate and talk to Michael Williams. R. 363. On recross-examination, Pressley stated that Simmons told him that Michael Williams was "[i]n the apartment asleep" when Simmons saw the appellant talking on the telephone on the victim's front porch. R. 370. Pressley also acknowledged that there was "nothing to corroborate what Mr. Simmons said." R. 371.
Defense counsel then sought to question Pressley as to why "Simmons' word is so strong" and whether it was "important" to corroborate Simmons' story. R. 371. The trial court sustained the prosecutor's objections to these questions. During the discussion that ensued, the trial court suggested that the detective might prefer to answer the last question. Defense counsel then withdrew the question, but the prosecutor asked Pressley to answer. R. 372. Detective Pressley stated, "You can only follow those leads that are given to you and those leads were not given to me." R. 372-73. After the prosecutor said that he had no further questions, defense counsel stated, "I wasn't asking about leads, I was asking you whether or not it was important to corroborate these allegations by Alfonso Simmons." R. 373. When the trial court sustained the prosecutor's objection, defense counsel ended his cross-examination of Pressley.
 "[A] criminal defendant has the right to a thorough and sifting cross-examination, but that right is not absolute. The latitude and extent of cross-examination are matters within the sound discretion of the trial court, and in the absence of abuse, that discretion is not reversible on appeal."
Ex parte Pope, 562 So.2d 131, 134 (Ala. 1989), cert. denied,498 U.S. 841, 111 S.Ct. 118, 112 L.Ed.2d 87 (1990). "The trial court has the discretion reasonably to limit the range of cross-examination in respect to collateral and irrelevant matters or with respect to matters that unnecessarily consume time in the trial of the case." C. Gamble, McElroy's AlabamaEvidence § 136.01 (4th ed. 1991). Furthermore, "[o]n appeal, the party claiming that a trial judge has abused his discretion in such aspect bears the burden of persuasion." Connell v.State, 294 Ala. 477, 481, 318 So.2d 710, 714 (1974).
Obviously, the State's case against the appellant would have been stronger had there been another witness to testify that the appellant was on the victim's front porch around 7:20 a.m. However, as we noted in Part I.B. above, there is no legal requirement that Simmons' testimony be corroborated. Moreover, Pressley's testimony clearly established that, although he had attempted to find other witnesses, he was unable to find anyone who could corroborate Simmons' story. Whether Pressley thought it was "important" to do so simply was not relevant to this case.
The appellant has failed to meet his burden of demonstrating that he was prejudiced by the trial court's action. As inColston v. State, 57 Ala. App. 4, 15, 325 So.2d 520, 530 (1975), cert. denied, 295 Ala. 398, 325 So.2d 531 (1976), "[w]e are unable to find that the trial court's refusal to allow appellant to continue such repetitious and futile . . . questioning amounted to a prejudicial limitation on the right of cross-examination."
For the reasons stated above, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] In a hearing out of the presence of the jury, it was established that Simmons had previously been before the trial court as a defendant. During this hearing, the trial court stated that Simmons was receiving "an SSI check, I think for diminished — some type of head problem." Simmons responded, "Yes, sir." R. 158. There is no further indication in the record of the nature of Simmons' problem and what, if any, effect it might had had upon his capacity as a witness.
[2] Contrary to the assertion in the appellant's brief, the time of the victim's death was not "set at 8:00 a.m." Appellant's brief at 22. Eddie Jones testified that he found the victim's body around 8:00 a.m., at which time she was not breathing. He also stated that the paramedics "tried to help her," but were not successful. It is not clear from Jones' testimony whether the victim was dead prior to the time the paramedics arrived or if she died while they were present. None of the paramedics who responded to Jones' 911 call testified and the forensic pathologist was not asked to estimate the time of the victim's death.
[3] We note that during the recess immediately before closing arguments there was some discussion of a stipulation that the establishment the appellant called a "Waffle House" was actually an "Omelette Shoppe." R. 730-31. However, there is nothing else in the record before us regarding this matter. Moreover, this discussion took place long after the appellant's original motion for a judgment of acquittal was made.
[4] The record reveals that a very brief recess was taken at 1:40 p.m., during cross-examination of the appellant. R. 628. The improper remark by the prosecutor was made some time after this recess. R. 664. The short recess taken at the close of the State's rebuttal case was taken at 2:55 p.m. R. 729. At 3:05 p.m., the jury was brought back to the courtroom, R. 740, and almost immediately thereafter, the trial court reinstructed them on the impropriety of the prosecutor's remark, R. 740-43.