LONG, Judge.
The appellant, M.T., Sr., was convicted of sodomy in the first degree, sexual abuse in the first degree, and sexual abuse in the second degree, violations of § 13A-6-63, § 13A-6-66 and § 13A-6-67, Code of Alabama 1975, respectively. The appellant appeals from these convictions.
The record reflects that the appellant and his wife separated sometime in October 1989, and that at that time she moved out of the house the couple had been occupying. The couple’s three children, M.T., A.T., and D.T., continued to live with their father. The couple divorced in June 1990; the appellant’s ex-wife subsequently remarried.
D.T., who was 14 years old at the time of the incident, testified that “sometime” (R. 63) before Christmas in 1989, his father called him to his bedroom, around midnight, and told him to rub lotion onto his legs. According to D.T., he had massaged his father’s legs on other occasions. D.T. testified that on this particular night, his father gave him some whiskey and instructed him to rub his legs and his genital area. D.T. testified that when he refused, the appellant reached over and placed his hand on a gun that was on the *1225 bedside table. D.T. stated that he then complied, because he was afraid of what the appellant might do.
D.T. testified that a second incident occurred approximately one month later. On that occasion, the appellant gave D.T. some Mad Dog 20/20, an alcoholic beverage, and some cigarettes. According to D.T., he and his father watched a pornographic movie. Following the movie, the appellant told D.T. to rub lotion on his legs and to “play” with the appellant’s penis. D.T. testified that he was afraid because he could see a gun on the nightstand, so he complied and rubbed the appellant’s penis to the point of ejaculation. D.T. stated that the appellant also tried to fondle his genitals, but that he prevented him from doing so.
A.T., who was 17 years old at the time and mentally impaired, testified that after his parents separated, his father called him to come into his bedroom and instructed him to rub lotion on his legs. According to A.T., the appellant was dressed in women’s clothing. On that occasion, the appellant directed A.T. to massage his genitals and A.T. complied. During the incident, A.T. observed a gun on the nightstand.
A.T. also testified regarding a second encounter with his father. A.T. said that the appellant again summoned him to his bedroom, where he gave him alcohol to drink. According to A.T., the appellant was again wearing women’s clothing. The appellant told A.T. to rub his genitals and to perform oral sex on him, and A.T. complied. A.T. testified that the appellant, in turn, briefly performed these acts on him. During this incident, A.T. saw the handle of a gun sticking out from underneath the pillow on the bed.
The appellant denied the allegations and testified that his sons had fabricated the stories because, he said, they were angry with him and wanted to move out of the house.
I.
The appellant contends that the trial court erred to reversal by allegedly improperly restricting his cross-examination of a state’s witness, Jo Hanson, a social worker assigned to the crisis intervention unit of the Department of Human Resources, who had taken statements from the two victims. We disagree.
During the cross-examination of Ms. Hanson, the following occurred:
“Q: (BY MR. BERRY [Defense Counsel] ): How long have you worked with Ms. Owens [an intake worker with the Department of Human Resources who took the initial report from the victims’ mother and who subsequently assigned the case to Jo Hanson]?
“A: Twenty years.
“Q: And out of the twenty years, do you know her reputation for truth and veracity?
“MR. NIEZER [Prosecutor]: Judge, I object to that.
“THE COURT: I sustain. Come down.
“MR. BERRY: I’m not through, Your Honor.
“THE COURT: You are finished right now, Mr. Berry.
“MR. BERRY: I’m objecting for the record. I’m not through with the witness.
“THE COURT: I don’t care what you’re doing. You’re fooling around here playing a game of evidence.
“MR. BERRY: I’m not through, Your Honor.
“THE COURT: I don’t appreciate it and I won’t have it.
“MR. BERRY: I object.
“THE COURT: I told you before, the fourth time I told you in this trial, now you’re not going to examine another witness if you do it again. You got that, Mr. Berry? I’ll go anywhere and testify to it. You understand? Where do you think you are? We’ve got evidence. You don’t ignore it in my courtroom. I don’t appreciate it a bit. Take a five minute break. Don’t you forget, Mr. Berry. If you do this again, you get no further examination.
*1226 ‘TTall have to forgive me now, but you get my attention if you keep on and on and on.
“(Recess.)
“THE COURT: You do that again and I’ll hold you in contempt. You got it, Mr. Berry?
“MR. BERRY: Yes, sir.
“THE COURT: Whatever I have to do, I'll do it. Hear, Mr. Berry?
“MR. BERRY: Yes, sir.
“THE COURT: Don’t you forget that. “MR. BERRY: I understand that, Your Honor. Trying to do my job.
“THE COURT: No, you’re not. You’re trying to fool with me.
“MR. BERRY: No, sir.
“THE COURT: I’ll put you in jail if that happens another time — you got that — on contempt of court.
“MR. BERRY: I understand that.
“THE COURT: All right. Let me ask the jury, each of you individually, can you put out of your mind anything that transpired with the Court, judge, and Mr. Berry or anybody else, not let it influence you in this case on the facts one way or the other and the law? If you can’t do that raise your hand.
“(No response.)
“THE COURT: These things occur on rare occasions and you have to listen, [be] subjected to listening to it, but don’t let it affect you now — that would be totally wrong — at all one way or the other for or against the defendant. I’ll tell you more about that later “Got another witness today?”
(R. 245-50.) (Emphasis added.)
“ ‘[A] criminal defendant has the right to a thorough and sifting cross-examination, but that right is not absolute. The latitude and extent of cross-examination are matters within the sound discretion of the trial court, and in the absence of abuse, that discretion is not reversible on appeal.’ ”
“Ex parte Pope, 562 So.2d 131, 134 (Ala.1989), cert. denied, 498 U.S. 841, 111 S.Ct. 118, 112 L.Ed.2d 87 (1990). ‘The trial court has the discretion reasonably to limit the range of cross-examination in respect to collateral and irrelevant matters or with respect to matters that unnecessarily consume time in the trial of the case.’ C. Gamble, McElroy’s Alabama Evidence § 136.01 (4th ed. 1991). Furthermore, ‘[o]n appeal, the party claiming that a trial judge has abused his discretion in such aspect bears the burden of persuasion.’ Connell v. State, 294 Ala. 477, 481, 318 So.2d 710, 714 (1974).”
Smiley v. State, 655 So.2d 1074, 1091 (Ala.Crim.App.1993), reversed on other grounds, 655 So.2d 1091 (Ala.1995). (Emphasis added.) See also, Wright v. State, 641 So.2d 1274, 1278 (Ala.Crim.App.1993); Cosby v. State, 627 So.2d 1059, 1061 (Ala.Crim.App.1993) (“[t]he extent of cross-examination is within the trial judge’s discretion and his decision will not be disturbed without a showing of an abuse of that discretion”); Beavers v. State, 565 So.2d 688, 689 (Ala.Crim.App.1990) (“[i]t is a well-established rule in this state that the latitude and extent of cross-examination are matters which of necessity rest largely within the sound discretion of the trial court, and rulings with respect thereto will not be revised on appeal except in extreme cases of abuse”).
From our review of the record, we cannot say that the trial court abused its discretion in limiting the defense’s cross-examination of Jo Hanson. Earlier in the cross-examination of Hanson, the trial court had admonished defense counsel to adhere to the rules of evidence when questioning the witness or risk having the questioning stopped. (R. 242^43.) It appears that when the defense counsel posed the question to Hanson that caused the trial court to halt the cross-examination, defense counsel was attempting to impeach Hanson in an impermissible manner. Specifically, it appears that defense counsel sought to cross-examine Hanson regarding her knowledge of Owens’s reputation for truth and veracity, when Owens had not testified at trial and Hanson had not testified to Owens’s good general reputation for truth and veracity on direct examination. See, generally, C. Gamble, McElroy’s Alabama Evidence, § 176.01(10) (4th *1227 ed.1991) (“[iff a -witness testifies to another’s good general reputation only with respect to truth and veracity, the witness may be asked on cross-examination whether he has heard rumors derogatory to such other if, but only if, the rumors inquired about are relevant to the trait of truth and veracity”). (Emphasis added.) If defense counsel’s intentions were otherwise, he should have made an offer of proof to the trial court when the trial court suspended the questioning. See, Myers v. State, 601 So.2d 1150, 1151 (Ala.Crim.App.1992), (contention that trial court erred in not allowing defense to cross-examine state’s witness about alleged prior inconsistent statements held not preserved for appellate review because defense counsel failed to make an offer of proof summarizing the expected testimony). Although the trial court’s response to what it considered to be an inappropriate line of questioning was harsh, we cannot say that it constituted an abuse of discretion in light of the record before this Court, particularly given the trial court’s pri- or admonishment to defense counsel to adhere to the rules of evidence in questioning witnesses.
Even if this Court were to determine that the trial court’s actions violated the appellant’s Sixth Amendment right to confrontation, reversal would still not be warranted, as any error was harmless error. Rule 45, Ala.R.App.P. On direct examination, the thrust of Jo Hanson’s testimony was that she had interviewed the victims and had found them to be credible. On cross-examination, before the eomplained-of action by the trial court, the appellant was allowed to question Hanson as to how she assessed the victims’ credibility. Furthermore, the appellant was allowed to question Hanson about perceived inconsistencies between the victims’ statements and their trial testimony and whether the inconsistencies changed her conclusion that the victims were credible. Thus, the appellant has failed to show how the trial court’s curtailment of his cross-examination prejudiced his defense to the point of reversal.
II.
The appellant contends that the remarks and conduct of the trial judge toward defense counsel deprived him of a fair and impartial trial. Specifically, the appellant contends that the trial court erred when it told defense counsel, in the presence of the jury, to “shut up now” as defense counsel was attempting to object to a question posed by the prosecution to a state’s witness. (R. 74.) The appellant also maintains that during defense counsel’s cross-examination of Jo Hanson, the trial court said, “You’re stopping her when you don’t like her answer. Quit it. Go ahead, dear.” (R. 239.) In further support of his contention that the trial court’s remarks and conduct were improper, the appellant also cites the excerpt from the record discussed in Part I of this opinion.
The allegedly improper comments must be examined in the context in which they were made. The first instance of alleged judicial misconduct occurred during the state’s direct examination of D.T., one of the victims. During the examination, the state asked D.T. whether his father had given him alcohol before the first incident of sexual abuse took place and D.T. indicated that he had. The •following then occurred:
“MR. BERRY [Defense counsel]: Your Honor, I object to the relevance to whether there was any alcohol. The charge is sexual related and alcohol has nothing to do with it.
“THE COURT: Overruled. Mr. Berry, I’m going to let the State show any circumstantial evidence whatever, direct evidence concerning the home life communication of this son with his daddy.
“MR. BERRY: Yes, sir.
“THE COURT: You can object all you want but I’m going to start just quickly overruling it if it’s pertinent to the time and place.... ”
,(R. 61-62.)
The state continued to question D.T. about the incidents with his father. Later in the state’s direct examination, the following occurred:
“Q: (BY MR. NIEZER [the prosecutor] ): You described him getting you up at 2:00 [a.m.] When was the other time you saw him dressed up like a woman? [D.T. *1228 had previously testified that he had also seen his father dressed like a woman.]
“A: The next day.
“Q: Was it daytime or nighttime?
“A: It was evening.
“Q: Was there anything said at that time or you just saw him dressed up?
“A: He was talking about how he could make more money—
“MR. BERRY [defense counsel]: Your Honor, I’m going to object. He’s not answering the question, and what they’re talking about—
“THE COURT: Okay. Sustained. Listen to the question and answer it before he asks you another one.
“Q: (BY MR. NIEZER): When you saw him dressed up the second time, did he say anything or was there a discussion at that time when you saw him dressed up—
“A: Yes, sir.
“MR. BERRY: Your Honor, unless he’s going to try to hook it up to something that deals with the indictment and charges against him, it’s irrelevant and immaterial.
“THE COURT: I’m going to allow any evidence in — you’re not listening, Mr. Berry, I’m ordering you to shut up now — if it relates to the character of the defendant and these boys. Now, you got that? Now, if you object again and it relates to these people, under the circumstances, I’m going to tell you ‘No, don’t ask another question.’ All right?
“MR. BERRY: Yes, sir.
“THE COURT: All right. Go ahead.
“MR. BERRY: For the record—
“THE COURT: Don’t forget, I’m not going to tell you again.
“MR. BERRY: I’ll protect the record.
“THE COURT: It’s not what’s going on, it’s the nature of what we have. Now, you’re forgetting. I told you, I don’t do it because of who they are. It’s the nature of what’s happening.
“My duty now, not yours. Don’t you pay any attention to my communications with Mr. Berry. It’s not evidence. It’s law, and it’s in the record. You understand now, if you can’t do that, raise your hand. Ignore me. If this goes on and on and with anybody, including this fellow, same thing applies. Go ahead.”
(R. 72-75.) (Emphasis added to highlight the portion that the appellant finds objectionable.)
The second and third incidents of alleged judicial misconduct occurred during the cross-examination of Jo Hanson, the Department of Human Resources employee who interviewed the victims:
“Q [defense counsel]: And how do you form a determination as to whether or not someone is telling the truth versus lying? What methods do you use to tell whether or not somebody is telling the truth or telling a lie?
“A: With the small children, I use my education charts to determine if they know the difference in a truth and a lie—
“Q: Well, let me—
“THE COURT: Wait a minute. Let her answer the question, now. You’re stopping her when you don’t like her answer. Quit it. Go ahead, dear. The children now.
(R. 288-39) (Emphasis added to highlight the portion the appellant finds objectionable.) The witness answered the question and the cross-examination continued. Defense counsel questioned the witness about how she reached the conclusion that the victims were credible, during which the following occurred:
“Q: (BY MR. BERRY): Okay. Let me ask you this: From the reports, if I say that it went from a statement of one of the alleged victims where he stated that he was forced to give oral sex to his father and to play with him, but then when it come [sic] to court, the material variance was such that his father also gave him oral sex, that’s quite a material — or is that quite a material variance to you?
“A: Are you saying that the witness was saying still that he was forced to give oral sex to the father, but then added also?
“Q: Added, a material variance, is that a material variance to you?
*1229 “A: To me that is giving additional details that someone might not have wanted to disclose earlier. It’s not recanting or contradicting what was said.
“Q: After three or four separate interviews and then coming out, that sounds like a change of story. Do you—
“THE COURT: I’m going to cut you off now. If you want to cross-examine this witness, Mr. Berry, you know how. You don’t stand there and argue with her and make an argument for the jury before them with this witness. If you’ve got anything else, ask her. If not, quit.
“MR. BERRY: Yes, sir, I’ve got a lot, Your Honor.
“THE COURT: Get on to it or I’ll stop you.
“MR. BERRY: Yes, sir.
“THE COURT: No more arguments with her. You argue that to the jury later.
“MR. BERRY: Yes, sir.
“THE COURT: [To the jury.] Forgive me, now. Y’all remember what I told you. Don’t consider this. This is me.”
(R. 241-243.) (Emphasis added.)
The cross-examination of the witness continued. A short time later, the exchange set forth in Part I occurred.
As noted above, the appellant contends that the trial court’s actions prejudiced him in the eyes of the jury. We disagree.
“Quite clearly, it is the duty of the trial judge ‘to be thorough, courteous, patient, punctual, just and impartial. Yet he is not required to be a “Great Stone Face” which shows no reaction to anything that happens in his courtroom. Allen v. State, 290 Ala. 339, 276 So.2d 583 (1973).’ Gwin v. State, 425 So.2d 500, 506-07 (Ala.Cr.App.1982), cert. quashed, 425 So.2d 510 (Ala.1983). A trial judge is not ‘a mere moderator’ of a trial. Sprinkle v. State, 368 So.2d 554, 562 (Ala.Cr.App.1978), cert. quashed, 368 So.2d 565 (Ala.1979). Instead, he has a vast array of responsibilities, including that of protecting witnesses ‘from improper questions and from harsh or insulting demeanor.’ See Ala.Code 1975, § 12-21-141. In discharging his responsibilities, the trial judge may ‘properly caution, correct, advise, admonish, and, to a certain extent, criticize counsel during the case, provided it is done in such manner as not to subject counsel to contempt or ridicule, or to prejudice accused in the minds of the jurors,’ 23A C.J.S. Criminal Law § 1182 (1989). ‘A trial judge who uses language which tends to bring an attorney into contempt before the jury, or makes any intimation which tends to prejudice the attorney, commits reversible error.’ Gwin v. State, 425 So.2d at 507.”
Arnold v. State, 601 So.2d 145, 153 (Ala.Crim.App.1992).
While the trial court’s manner does appear to have been somewhat brusque, we cannot say, after applying the law set forth to the instant ease, that the trial court’s comments prejudiced the appellant in the eyes of the jury. Our review reveals “no evidence ... that defense counsel was admonished without cause or that he was treated more severely than counsel for the state.” Hampton v. State, 620 So.2d 99, 104-105 (Ala.Crim.App.1992). Moreover, the trial court instructed the jurors to disregard the remarks between the trial court and counsel and questioned them to ensure that they could disregard the remarks, “thus ensuring that no prejudice resulted from [the] remark[s].” Arnold, 601 So.2d 145, 153.
III.
The appellant contends that the trial court erred in denying his motion for a new trial, which was based, in pertinent part, on the assertion that one of the victims recanted his trial testimony. We disagree.
The record reflects that the appellant, through new appellate counsel, filed a motion for a new trial wherein he alleged that newly discovered evidence entitled him to a new trial. Specifically, the appellant maintained that he was entitled to a new trial because D.T. had subsequently recanted his accusations against him and because, he said, he had evidence that A.T. was also lying about the accusations against him.
*1230 A hearing was held on the motion for a new trial.[1] At the hearing, D.T. testified that his father had never sexually abused him. He stated that his stepfather had coached him for two years about what to say and that his stepfather had also encouraged him to say that his father had a gun during the incidents. D.T. admitted that he never told the district attorney that he had been coached. When asked why he had lied during the trial, D.T. responded that his brother had said something about having been being sexually abused so he said that it had happened to him also. D.T. maintained that his stepfather encouraged him to say that a gun was used because, he said, his stepfather and mother were trying to get one-half of his father’s business.
On cross-examination, D.T. admitted that he had talked to Jo Hanson, with the Department of Human Resources, and that he had told her that his father had sexually assaulted him. He admitted that he initially told his mother and stepfather that he had been sexually assaulted and that they did not come to him and tell him to fabricate the story.
On redirect, D.T. indicated that when he initially said that his father had molested him, he was angry with his father. On recross, D.T. testified that he and A.T. had concocted the story against their father.
The trial court questioned D.T. and specifically asked him why he would make up a story against his father. D.T. indicated that he did not know, but thought that he might have done it to get back at his father because his father took him to live with his mother.
M.T., the oldest brother, also testified at the hearing on the motion for new trial. He stated that he had recently talked with A.T., the other victim of the crime, about their father’s conviction. According to M.T., A.T. told him that he had lied in the courtroom. He testified that A.T. said that he had lied because of pressure from his mother, his stepfather, and D.T. M.T. maintained that A.T. was very easily influenced due to his mental deficiencies.
At the conclusion of the hearing, the trial court denied the motion for a new trial with an extensive explanation. ■ (S.R.36-40.) In sum, the trial court indicated that it did not find D.T.’s testimony in the new trial hearing to be credible. The trial court was not satisfied with D.T.’s explanation of why he had lied in the trial.
“In order to grant a motion for new trial alleging perjured testimony, the trial court must be reasonably well satisfied 1) that testimony given by a witness at trial was false; 2) that there is a significant chance that had the jury heard the truth, it would have reached a different result; 3) that the evidence tending to prove the witness’s perjury has been discovered since the trial; and 4) that that evidence could not have been discovered before or during trial by the exercise of due diligence.
[[Image here]]
“... [A] presumption of correctness will continue to be indulged in favor of the trial court’s factual findings, and the trial court’s ruling on the motion will be upheld on appeal unless it is clearly erroneous .... ”
Ex parte Frazier, 562 So.2d 560, 569-70 (Ala.1989). (Emphasis added.)
With regard to recanted testimony, this Court has held:
“ ‘A material error or misstatement in the testimony of the witness for the prosecution may constitute ground for a new trial ... But recantation by witnesses called on behalf of the prosecution does not necessarily entitle defendant to a new trial. The question of whether a new trial shall be granted on this ground depends on all of the circumstances of the case, including the testimony of the witnesses submitted on the motion for the new trial. Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true.’ Henderson v. State, 136 [135] Fla. 548, *1231 185 So. 625, 630 (1939); Borgess v. State, 455 So.2d 488 (Fla.App. 1 Dist.1984).
“Further, ‘the Court’s, with their experience with witnesses, generally pay but little regard to the statement of recanting witnesses, and only in extraordinary cases will a new trial be allowed because of recanting statements.’ Wallace v. State, 41 Ala.App. 65, 124 So.2d 110, cert. denied, 271 Ala. 701, 124 So.2d 115 (1960); See 158 A.L.R. 1062-1063; Peterson v. State, 426 So.2d 494 (Ala.Crim.App.1982); cert. denied, 426 So.2d 494 (Ala.1983). See also, State v. Scanlon, [108 Ariz. 399], 499 P.2d 155 (1972); Best v. State, 418 N.E.2d 316 (Ind.App.1981).
“The general rule regarding the awarding of a new trial based on recanting witness is that, where independent evidence corroborates the testimony that a witness later seeks to recant, the grant of a new trial rests within the sound discretion of the trial judge. However, when a defendant is convicted solely on the testimony of the now recanting witness, it would be an abuse of discretion not to allow a new trial. See State v. Scanlon, supra; Commonwealth v. McCloughan, 279 Pa.Super. 599, 421 A.2d 361 (Pa.Super.1980); Best v. State, supra; Borgess v. State, supra; State v. Rogers, 703 S.W.2d 166 (Tenn.Cr. App.1985); State v. York, 41 Wash.App. 538, 704 P.2d 1252 (Wash.App.1985).”
Robinett v. State, 494 So.2d 952, 955 (Ala.Crim.App.1986).
The trial court did not abuse its discretion in denying the motion for a new trial. The trial court carefully considered D.T.’s testimony at the trial and at the hearing on the motion for a new trial and did not find his testimony at the new trial hearing to be credible. The trial court was in the best position to assess D.T.’s credibility regarding his conflicting stories. Moreover, A.T.’s testimony, which tended to corroborate D.T.’s trial testimony, was still before the Court for its consideration, as well as Jo Hanson’s trial testimony. Accordingly, we can find no abuse of discretion in the trial court’s denial of the motion for a new trial.
For the reasons stated above, the judgment of the trial court is affirmed.
AFFIRMED.
PATTERSON and McMILLAN, JJ., concur.
TAYLOR, P.J., dissents with opinion, with COBB, J., joining.

. The hearing on the motion for a new trial was held before a different judge than the judge who presided over the trial. The judge indicated that he had read the trial transcript before the hearing.